**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

NICOLE KIBERT BASLER, GAIL AMEND,
VIOLET WHEAT, MICHAEL DONLEY,
BECKY HERRINGTON, JUAN LEON,
BARBARA QUEDNAU, LISA GOEKE,
KERRI VINCENT, MILES FAWCETT,
CHRISTIAN FIGUEROA, KEVIN HEMPHILL,
GEOFF EDWARDS, and LORI MORSE,
individually and on behalf of all others similarly
situated,                                                              CASE NO.: 2:22-cv-1386

      Plaintiffs,                                          JURY TRIAL DEMANDED

v.

GENERAC POWER SYSTEMS, INC.,

      Defendant.
_____/


## CLASS ACTION COMPLAINT

Plaintiffs Nicole Kibert Basler, Gail Amend, Violet Wheat, Michael Donley, Becky Herrington, Juan Leon, Barbara Quednau, Lisa Goeke, Kerri Vincent, Miles Fawcett, Christian Figueroa, Kevin Hemphill, Geoff Edwards, and Lori Morse ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action against Defendant Generac Power Systems, Inc. ("Generac" or "Defendant") and allege the following based on personal knowledge as to themselves, and as to all other matters, upon information and belief, including investigation conducted by their attorneys.

1

## NATURE OF THE ACTION

1.     This action concerns clean energy management systems designed and manufactured by Generac, which contain a defective component[1] and were subsequently sold to consumers across the United States.

2.     Generac has provided consumers "Affordable Power Solutions for 60 years" and is the self-proclaimed "#1 manufacturer of home backup generators."[2]  Generac "manufactures the widest range of power products in the marketplace including portable, residential, commercial and industrial generators."[3]  Generac's offerings include "backup and prime power generation systems for residential and commercial & industrial (C&I) applications, solar + battery storage solutions, energy management devices and controls, advanced power grid software platforms & services, and engine & battery-powered tools and equipment."[4]  Generac purports to "protect the things that power your life by providing quality, affordable power solutions."[5]  As of August 2022, Generac's net sales (LTM) were $4.4 billion.[6]

3.     Generac represents itself as being on the cutting edge of the energy market and purportedly seeks to provide cost-efficient and environmentally sustainable solutions to its customers.  To its investors, Generac claims that it "is developing and launching innovative clean

---

[1] Upon information and belief, the defective component of the PWRcell consists of the SnapRS connectors.  There are three models of SnapRS connecter components, (the 801, the 801A, and the 802).  Upon information and belief, all three models contain the same or a similar design and/or manufacturing defect.

[2] *About Us*, Generac, https://www.generac.com/about-us (last visited Sept. 26, 2022).

[3] *Id.*

[4] *Investor Relations*, Generac, https://investors.generac.com/ (last visited Sept. 26, 2022).

[5] *About Us*, Generac, https://www.generac.com/about-us (last visited Sept. 26, 2022).

[6] *Investor Presentation – August 2022*, Generac, https://investors.generac.com/static-files/a9f36c1c-9836-436b-ae20-84bdb21b3b62 (last visited Sept. 26, 2022).

energy products that not only increase and optimize the amount of clean energy produced, stored and utilized by homeowners, but help to maximize customer savings."[7]

4.      As a part of its clean energy offerings, Generac manufactures the PWRcell system (the "System"), which it represents as "the complete clean energy system."[8]  According to Generac, "The PWRcell system is not just a powerful battery, but is also the most flexible and scalable home energy system on the market."  Furthermore, Generac boasts that "PWRcell offers 30% more power output than our competitors[], and it offers more storage capacity."[9]  The System takes electricity produced by solar panels (not part of the PWRcell system but must be integrated into the System) and gives consumers the option of managing how that electricity is used, either for powering their homes, for storage in a generator, for storage in back-up batteries, or for net-metering (selling electricity back to the utility company that traditionally powered the consumer's home).  A consumer can program how the electricity is used and track electricity production from within a Generac phone application.

5.      The baseline starting price for the System is approximately $47,000.00 (including installation), and consumers can customize by adding additional battery modules based upon the size of their homes and energy needs.[10]  Generac advertises that consumers who use a fully

_____

[7] *Environmental, Social, and Governance Report 2021*, Generac, https://investors.generac.com/static-files/edaf815c-9f4f-4453-8b1e-0f61f9175255 (last visited Sept. 26, 2022).
[8] *PWRCELL*, Generac, https://www.generac.com/all-products/clean-energy/pwrcell (last visited Sept. 26, 2022).
[9] *PWRCELL Solar + Battery Storage System*, Generac, https://www.generac.com/GeneracCorporate/media/Library/content/Clean%20Energy/PWRcell/PWRcell_Consumer_Brochure-Digital-9-15-22.pdf (last visited Sept. 26, 2022).
[10] *Id.*

functional System will save $66,217.00 over 25 years.[11]  Consumers purchase the Systems through Generac's authorized dealers.

6.      Unfortunately, consumers do not receive the benefits of a fully functional System because the System contains a design and/or manufacturing defect, described in more detail *supra*, that renders it unsuitable for its intended use.  Specifically, each System contains "SnapRS" connector components (the "Snaps").[12]  During the course of normal and expected use of the System, the Snaps will overheat, melt, explode, and otherwise malfunction (the "Defect").  Without properly functioning SnapRS units, the System's performance declines or ceases.

7.      Generac has undertaken a deliberate and willful pattern of conduct (including taking active measures) aimed at concealing the Defect from its consumers, including Plaintiffs and putative Class Members.

8.      At all relevant times, Generac knew or should have known about the Defect but nevertheless marketed, advertised, and sold the Systems without disclosing the Defect or warning consumers that the Snaps overheat, melt, explode, or otherwise malfunction.

9.      Generac fails to disclose the known Defect or provide consumers with a non-defective replacement.  Indeed, rather than providing consumers with new, non-defective Snaps after they fail as a result of the Defect, Generac fails to provide a non-defective replacement component capable of remedying the problem and/or improperly denies consumers' warranty claims.  Generac's purported solution, its newest version of the Snaps (the 802s), fails just as earlier models did.

---

[11] *Id.*
[12] *Id.*

10.     Alternative designs presently exist in the marketplace and are sold to consumers by Generac's competitors.  Despite Generac representing that replacement Snaps are available to consumers, customers are unable to purchase the parts directly from Generac or receive service from authorized dealers, leaving them with Systems that do not function as intended or seeking service from technicians outside of Generac's dealership network, forcing consumers to void their warranties in order to receive service on their Systems.

11.     As a direct and proximate result of Generac's concealment of the Defect, its failure to warn customers about the Defect before their purchase, and its failure to recall the Systems or remedy the Defect, Plaintiffs and putative Class Members purchased the defective Systems when they otherwise would not have made such purchases on the same terms or at all, or would not have paid as much for the defective Systems.

12.     Plaintiffs and putative Class Members' Systems failed or are likely to fail as a result of the Defect when they attempted to use the Systems as intended, resulting in damaged and unusable Systems.

13.     Plaintiffs and putative Class Members' Systems contain the uniform Defect at the point-of-sale and Generac's Systems cannot be used for their intended purpose of safely and reliably managing electricity.

## THE PARTIES

14.     Plaintiff Nicole Kibert Basler is a resident and citizen of Atlanta, Georgia.  She purchased one of the aforementioned Systems at issue on or around March 28, 2021.  Currently, the System is not performing as expected and contains the defective component.

5

15.     Plaintiff Gail Amend is a resident and citizen of Oblong, Illinois. She purchased one of the aforementioned Systems at issue on or around February 2022. Currently, the System is not performing as expected and contains the defective component.

16.     Plaintiff Violet Wheat is a resident and citizen of Terre Haute, Indiana. She purchased one of the aforementioned Systems at issue in or around November 9, 2021. Currently, the System is not performing as expected and contains the defective component.

17.     Plaintiff Michael Donley is a resident and citizen of Basehor, Kansas. He purchased one of the aforementioned Systems at issue on or around February 18, 2022. Currently, the System is not performing as expected and contains the defective component.

18.     Plaintiff Becky Herrington is a resident and citizen of Rockford, Michigan. She purchased one of the aforementioned Systems at issue on or around October 28, 2020. Currently, the System is not performing as expected and contains the defective component.

19.     Plaintiff Juan Leon is a resident and citizen of Romulus, Michigan. He purchased one of the aforementioned Systems at issue on or around June 18, 2021. Currently, the System is not performing as expected and contains the defective component.

20.     Plaintiff Barbara Quednau is a resident and citizen of South Rockwood, Michigan. She purchased one of the aforementioned Systems at issue in or around June 2020. Currently, the System is not performing as expected and contains the defective component.

21.     Plaintiff Lisa Goeke is a resident and citizen of Bloomsdale, Missouri. She purchased one of the aforementioned Systems at issue in or around March 2020. Currently, the System is not performing as expected and contains the defective component.

22. Plaintiff Kerri Vincent is a resident and citizen of Collins, Missouri. She purchased one of the aforementioned Systems at issue on or around June 25, 2022. Currently, the System is not performing as expected and contains the defective component.

23. Plaintiff Miles Fawcett, Jr. is a resident and citizen of South Park, Pennsylvania. He purchased one of the aforementioned Systems at issue on or around November 24, 2020. Currently, the System is not performing as expected and contains the defective component

24. Christian Figueroa is a resident and citizen of White, Pennsylvania. He purchased one of the aforementioned Systems at issue on or around Whitehall. Currently, the System is not performing as expected and contains the defective component.

25. Plaintiff Kevin Hemphill is a resident and citizen of New Castle, Pennsylvania. He purchased one of the aforementioned Systems at issue on or around October 1, 2021. Currently, the System is not performing as expected and contains the defective component.

26. Plaintiff Geoff Edwards is a resident and citizen of Nashville, Tennessee. He purchased one of the aforementioned Systems at issue on or around May 30, 2022. Currently, the System is not performing as expected and contains the defective component.

27. Plaintiff Lori Morse is a resident and citizen of Stuart, Virginia. She purchased one of the aforementioned Systems at issue on or around February 20, 2021. Currently, the System is not performing as expected and contains the defective component.

28. Defendant Generac Power Systems, Inc. is, upon information and belief, is a publicly-traded Wisconsin corporation with a principal place of business located at S45W29290 Highway 59, Waukesha, Wisconsin, 53189.

29. Generac distributes, markets, and directs the marketing of its products, including the aforementioned Systems, throughout the United States.

7

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (a) there are 100 or more putative Class Members; (b) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (c) there is minimal diversity because Plaintiffs and Defendant are citizens of different states. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

31.     This Court has personal jurisdiction over Defendant because Defendant has substantial aggregate contacts with this District, including engaging in conduct that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and purposely availed itself of the laws of the United States and the State of Wisconsin.

32.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this District, Defendant transacts business in this District, and Defendant has intentionally availed itself of the laws and markets within this District.

## COMMON FACTUAL ALLEGATIONS

33.     Generac is a publicly-traded manufacturer of clean energy management systems with customers across the globe. Approximately 85% of its net sales (LTM) are domestic, and 67% of those sales consist of residential energy products.[13]   Generac has over 10,000 employees worldwide and an adjusted EBITDA (LTM) of $897 million.[14]

---

[13] *Investor Presentation – August 2022*, Generac, https://investors.generac.com/static-files/a9f36c1c-9836-436b-ae20-84bdb21b3b62 (last visited Sept. 26, 2022).
[14] *Id.*

8

34.     Generac considers customer service to be a "core element of [its] enterprise strategy."[15]  According to Generac, its engineers maintain "rigorous design standards that account for product safety at every stage of product development, and products go through multiple rounds of design review to ensure that safety is paramount."[16]  Additionally, Generac represents that "Excellence is one of our Corporate Values, and our product quality team exemplifies this value through vigorous involvement in both our new product development and production processes."[17] Generac "maximize[s] the quality and value of [its] products for [its] customers" by "regularly perform[ing] design reviews and testing."[18]

35.     According to the Solar Energy Industries Association, the value of the solar power market in the United States alone is $33 billion.[19]  Growth of electricity production from solar energy has been exponential, more than 80 times its share a decade ago.[20]  At current rates, 13% of homes in the United States will have solar PV systems by 2030.[21]

36.     Generac seeks to capitalize on the burgeoning solar energy market as its "purpose" is to "lead the evolution to more resilient, efficient, and sustainable energy solutions" and sees solar as one of several "strategic growth themes" for the business.[22]  As the United States energy

---

[15] *Environmental, Social, and Governance Report 2021*, Generac, https://investors.generac.com/static-files/edaf815c-9f4f-4453-8b1e-0f61f9175255 (last visited Sept. 26, 2022).
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Solar Data Cheat Sheet*, Solar Energy Industries Association, https://www.seia.org/research-resources/solar-data-cheat-sheet
[20] *Id.*
[21] *Id.*
[22] *Investor Presentation – August 2022*, Generac, https://investors.generac.com/static-files/a9f36c1c-9836-436b-ae20-84bdb21b3b62 (last visited Sept. 26, 2022).

9

production systems shift, Generac seeks to unlock $72 billion by 2025 with residential clean energy as a "key driver" of its strategic evolution.[23]

37.    Generac's main clean energy product consists of its PWRcell system, which it designed and manufacturers.[24]  Generac describes the System as "a fully-integrated solar + battery storage system," as depicted below[25]:



38.    Notably, a consumer cannot purchase solar panels from Generac.  The purpose of the PWRcell is to manage electricity produced by solar panel modules for consumption within a consumer's home.  In order to integrate existing solar panels into the PWRcell System and a consumer's overall electricity intake, Generac utilizes PV Link and SnapRS connector

---

[23] *Id.*
[24] *PWRCELL Solar + Battery Storage System*, Generac,
https://www.generac.com/GeneracCorporate/media/Library/content/Clean%20Energy/PWRcell/
PWRcell_Consumer_Brochure-Digital-9-15-22.pdf (last visited Sept. 26, 2022).
[25] *Id.*

components.[26]  The PV Link "allows you to connect 2 to 9 solar PV modules, enabling you to build a flexible, easy-to-install solar array."[27]  The SnapRS (Rapid Shutdown Device) connector "is an in-line disconnect device that helps to satisfy module-level rapid shutdown requirements"[28] by "isolat[ing] each PV module in the array"[29] as shown below[30]:



Diagram is applicable for most 60 cell PV modules. Modules with higher cell count may require a different arrangement. Contact Generac for more details.

39.    Generac advertises that its Snaps meet National Electrical Code 2017 and 2020 requirements and are "[p]lug and play" and that "installation is quick and tool-free."[31]  Generac warrants that the Snaps are able to reduce output to 75 V in under ten seconds.[32]  The product warranty extends for 25 years, as depicted below[33]:

[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *SnapRS® Spec Sheet*, Generac, https://www.generac.com/service-support/product-support-lookup/product-support-details?productid=4194798d-a712-4fc2-abe4-08ed498f43de (last visited Sept. 26, 2022).
[30] *Id.*
[31] *PWRcell Full System Overview*, Generac, https://www.generac.com/for-homeowners/clean-energy/clean-energy-ecosystem (last visited Sept. 26, 2022).
[32] *Id.*
[33] *Id.*

| SnapRS™ (APKE00011) | |
|---|---|
| PV MODULE MAX VOC: | 75 V |
| EFFICIENCY: | 99.8%[3] |
| MAX INPUT CURRENT: | 13 A |
| MAX TOTAL QTY IN SUBSTRING: | 10 |
| SHUTDOWN TIME: | < 10 Seconds |
| ENCLOSURE RATING: | NEMA 6P |
| OPERATING TEMPERATURE - FAHRENHEIT (CELSIUS): | -40 to 158 °F (-40 to 70 °C) |
| CERTIFICATIONS: | UL1741 |
| PROTECTIONS: | PVRSE |
| WARRANTY: | 25 Years |

[3]When used with a 50V panel

40. Elsewhere, Generac explains its Limited Warranty for each part of the System and again indicates that the warranty governing the Snaps is 25 years[34]:

### Generac Power Systems Limited Warranty for Generac PWRcell®

For the period of warranty noted below and beginning upon the successful registration of the unit, Generac Power Systems, Inc. (Generac) warrants that its Generac PWRcell® products will be free from defects in material and workmanship for the items and period set forth below. Any equipment that the purchaser/owner claims to be defective should be reported to Generac customer service for evaluation and resolution. Generac will, at its discretion, repair or replace any part(s) which, upon evaluation, inspection, and testing by Generac, an Independent Authorized Service Dealer or certified installer, is found to be defective.

| Product | Model Number | Warranty Period | Coverage |
|---|---|---|---|
| Generac PWRcell Battery Cabinet | APKE00007 APKE00028 | 10 years | Parts, Labor, and Limited Travel |
| Generac PWRcell Battery Modules | A0000391219 G0080040 G0080001 G0080003 G0080005 | 10 years or 7.56MWh of energy throughput per module, whichever comes first (i.e. a six module system carries a warranty of 10 years or 45.36 MWh of total energy throughput). Capacity retention guarantee at the end of the warranty period: At least 70% of nameplate rating. | |
| Generac PWRcell Inverter | APKE00014 APKE00013 XVT076A03 XVT114G03 | 10 years | |
| PWRmanager™ | G0080090 | 10 years | |
| PV Link™ | APKE00010 | 25 years | |
| SnapRS™ | APKE00011 RS801a RS802 | 25 years | |

41. The Snaps are installed to make rapid shutdown possible. However, without functioning Snaps, electricity produced by single solar panel modules is unable to circulate around

---

[34] *Generac Power Systems Limited Warranty for Generac PWRcell®*, Generac, https://prod-generacsoa.azurefd.net/manualsweb/manuals/APKE00011/A0000416920 (last visited Sept. 26, 2022).

12

the solar panel array to the PV Link and, subsequently, into a consumer's home for any purpose. A single Snap is installed between each solar panel module in order to isolate each individual module. However, the PV Link creates a circuit that flows from solar panel module to solar panel module through Snaps into the PWRcell Inverter, such that a damaged or destroyed Snap disrupts the flow of the entire circuit and may render an array (of up to eight solar panel modules) useless.

### The Defect

42.     The SnapRS components connect each solar panel module on the roof of a home to form a singular solar panel array. Electricity flows through the Snaps into the PV Link, and then into battery storage. The Snaps should stay "on" or "off" unless activated with the intention of shutting down or restarting the flow of electricity.

43.     However, due to a defect by design or from manufacture, the Snaps are overactive such that they turn "on" and "off" *repeatedly* instead of *remaining* in the "on" or "off" position, which can cause the units to overheat, leaving the Snaps deformed and, in some cases, charred. This deformation can cause the Snaps to bulge and separate.

44.     Additionally, upon overheating, customers can experience a "PVRSS Lockout" error in their Systems, which causes the Systems to shut down. When a PV Link or Inverter detects a malfunctioning or overheating Snap in a particular solar panel array, the entire array goes into "lockout mode" and ceases to generate any power until the lockout is cleared. Clearing the lockout generally requires a service technician to replace the faulty Snaps causing the "lockout mode."

45.     Upon information and belief, Generac has acknowledged a near 50% failure rate in its Snaps.

46.     Following an inundation of complaints regarding general performance issues with the System, Generac issued firmware updates in or around August 2021 that could be downloaded

Case 2:22-cv-01386-LA    Filed 11/21/22    Page 13 of 97    Document 1

to the System.  The updates would keep the "on" or "off" signal constant until the System was forced into rapid shutdown as intended with the functionality of the Snaps.

47.     Despite the update to the Systems, overheating issues with the Snaps persisted. This was due, in part, to the fact that some customers did not have their systems connected to the Internet (which Generac was aware of or should have been aware of due to Generac's ability to monitor consumers' systems) and thus did not receive the firmware updates.  Worse yet, the firmware updates caused customers' Systems to shut down for extended periods of time.

48.     In late 2021, Generac released its second model of Snaps, the 801A.  This model was released as a redesign of the original 801 Snap model in an attempt to resolve the Defect. However, the Defect persisted, as did the "PVRSS Lockout" issue.

49.     On or about June 2022, Generac admitted to needing to replace the 801 and 801A Snap models.  Specifically, Generac stated that there were issues that it needed "[t]o address" and that it needed to "help better optimize and enhance the performance of [its] PWRcell solar + storage systems over the long-term."  Generac stopped short of admitting that the Snaps were defective and failed to warn consumers about any of the issues with the Snaps.

50.     At the same time, Generac announced the release of the 802 Snap model, which Generac described as being "designed and engineered to the highest safety and reliability standards."  Generac highlighted that the 802 Snap model "ha[d] been tested in extreme heat and corrosive moisture conditions with exceptional results."  However, Generac has not replaced *all* Snaps currently in use to date and the Defect continues to manifest.

51.     The Defect renders the Systems unfit for the ordinary purpose for which they are purchased and used, which is to safely and reliably manage electricity.

14

52.     As a result of the Defect, the Systems pose an unreasonable risk of harm to consumers and their property and are subject to premature failure.  The Snaps overheat, melt, explode, and otherwise malfunction, which can cause fire damage to consumers' homes as well as power surges, loss of electricity, and loss of monetary savings consumers expected when purchasing the Systems.

53.     Had Plaintiffs and putative Class Members known that the Systems were defective, posed an unreasonable risk of harm to themselves and their property, and could and would cause damage, they would not have purchased the Systems at all, on the same terms, or for the same price.

54.     Generac expressly and impliedly warrants, via user manuals, advertisements, pamphlets, brochures, circulars, samples, and/or models, that the Systems are fit for the ordinary purpose for which they are sold.

55.     Generac expressly warrants in its Limited Warranty that the Snaps will be free from defects for 25 years.[35]

56.     Although consumers purchase the Systems through Generac's authorized dealers, Generac's manifest intent that its warranties apply to Plaintiffs and putative Class Members as third-party beneficiaries is evident from the statements contained in its literature concerning the Systems.  For example, the Limited Warranty states that "Any equipment that the purchaser/owner claims to be defective should be reported to Generac customer service for evaluation and resolution."  Additionally, the Limited Warranty states that the "Warranty is transferable between ownership of original installation site only."  The Limited Warranty intends that whoever owns

---

[35] *Generac Power Systems Limited Warranty for Generac PWRcell®*, Generac, https://prod-generacsoa.azurefd.net/manualsweb/manuals/APKE00011/A0000416920 (last visited Sept. 26, 2022).

the System retains the rights under the warranty, which here includes Plaintiffs and putative Class Members. Likewise, on Generac's website, the information pertaining to the Systems falls under the dropdown menu category for "HOMEOWNERS" and not "BUSINESS & INDUSTRY," "GRID SERVICES," and "DEALERS & INSTALLERS." Generac plainly contemplates that the homeowner is the individual with rights under the Limited Warranty and as such, Plaintiffs and putative Class Members are third-party beneficiaries. Lastly, it was reasonably foreseeable that Plaintiffs and putative Class Members would be the intended beneficiaries of the Systems and Limited Warranty.

57. Generac's Limited Warranty fails of its essential purpose for the following reasons:

a. Generac fails to disclose at the time of sale its knowledge of the Defect to consumers;

b. Generac fails to disclose its knowledge of the Defect when contacted by customers about System failures; and

c. Generac consistently fails to replace defective Snaps with purportedly non-defective counterparts despite representing that the 802 Snap model is available.

d. Generac has failed to produce a sufficient amount of Snaps to replace all defective Snaps.

e. Generac has no non-defective Snap component available for consumers. The 802 Snap model is defective and causes the same or similar errors in consumers' Systems.

58. As described herein, Generac breached the Limited Warranty at the time it shipped the Systems (and at the point-of-sale to consumers) because the Snaps were defective when they came off of the assembly line. The Defect causes the Snaps to overheat, melt, explode, or otherwise malfunction, making consumers unable to properly or safely use the Systems. Thus, at the time the Systems were shipped and sold to consumers, Generac was in violation of the express warranty.

16

59.     Further, because Generac does not have non-defective Snaps available to replace the defective Snaps or does not have the capacity to replace the defective Snaps, and because its replacement Snaps are not able to resolve the Defect, it is unable to fulfill its warranty obligations at the point of purchase, or anytime thereafter, and the Limited Warranty is therefore breached immediately upon purchase.

60.     In addition, the Limited Warranty is unconscionable as follows:

   a.     In its limitation that the Limited Warranty only begins after a consumer has registered;

   b.     In its limitations on transfer of the Limited Warranty only between ownership of the original installation site only;

   c.     In its limitation that the Systems remain connected to the Internet at all times;

   d.     In its failure and refusal to extend the time limitation at the time a replacement Snap is installed;

   e.     In its requirement for consumers to utilize Independent Authorized Service Dealers or certified installers when those authorized dealers and installers will refuse to service consumers' Systems.

   f.     In its disclaimer of warranties; and

   g.     In its limitation of remedies, including disclaimer of incidental and consequential damages.

61.     The Limited Warranty is also unconscionable given Generac's knowledge of the Defect, the existence of the Defect at the point-of-sale, Generac's failure to disclose the Defect at the time of sale and during warranty communications, and in the premature failure of the System.

62.     Any limitations on the Limited Warranty are also procedurally unconscionable. There was unequal bargaining power between Generac, on the one hand, and Plaintiffs and putative Class Members, on the other.  The Systems are a substantial investment on the part of consumers, who otherwise have no ability to negotiate the price or terms of the Limited Warranty.

17

63.     Any limitations on the Limited Warranty are also substantively unconscionable. Generac knew the Systems were defective and would continue to fail due to overheating. The Systems pose a safety risk to consumers because the Defect, that the Snaps overheat, melt, explode, and otherwise malfunction, causes the solar panel array within which the Snaps operate to cease production of electricity and, instead, to catch fire. Generac failed to disclose the Defect to Plaintiffs and putative Class Members. When consumers complain about System failure, Generac actively conceals the existence of the Defect and prevents consumers from discovering it. Thus, Generac's enforcement of any limit on these warranties is harsh and shocks the conscience.

64.     On or about August 9, 2022, Power Home Solar d/b/a Pink Energy (individually and collectively hereafter, "PHS"), a Generac authorized dealer, indicated to consumers that it was committed to ensuring that the Systems it installed would operate safely and would provide replacement parts as quickly as it could. Generac intended that consumers who purchased the Systems through PHS were to receive all warranty-related repairs through PHS. However, consumers who purchased through PHS are left with little-to-no recourse because PHS is no longer operating.

65.     Additionally, and as a result, Generac's other dealers are facing significant backlogs or are unwilling to provide service on PHS-installed Systems, or otherwise are unable to provide warranty service to Generac's consumers.

66.     Generac has actively concealed the existence and nature of the Defect from Plaintiffs and putative Class Members, despite its knowledge of the existence and pervasiveness of the Defect, and certainly well before Plaintiffs and putative Class Members purchased the Systems and during warranty communications. Specifically, Generac has:

18

a. Failed to disclose the Defect to consumers, at or after the time of purchase, including when consumers make warranty claims or otherwise complain to Generac about the Defect;

b. Actively concealed the Defect from consumers, at or after the time of purchase, including when consumers make warranty claims, or otherwise complain to Generac about the Defect;

c. Failed to disclose, and actively concealed the Defect from consumers, including that the Systems, specifically the Snaps, were not fit for their intended purpose;

d. Failed to disclose and actively concealed the Defect from consumers when it provided them with replacement Snaps that contained the same or similar Defect;

e. Failed to disclose and actively concealed the Defect from consumers when it provided them with firmware it knew would fail to remedy the Defect;

f. Failed to disclose and actively concealed the Defect from consumers when it provided them with replacement Snaps, without remedying the actual Defect, and when it knew the Systems could fail again; and

g. Failed to disclose and actively concealed the Defect from consumers when it announced the availability of the 802 Snap model as a performance-enhancing Snap without disclosing the Defect, making the 802 Snaps generally available to consumers to install in their Systems, and not actually remedying the Defect with the 802 Snap model.

67. As a direct, proximate, and foreseeable result of the Defect, Plaintiffs and putative Class Members suffered damages, including but not limited to: (a) the difference in value of the Systems as purchased and the Systems as received; (b) loss of use of the Systems; (c) cost to repair or replace the Systems, including labor and parts; (d) consequential damages; and (e) damage to property other than the Systems.

68. Plaintiffs and putative Class Members were in privity with Generac because Generac makes direct representations to consumers, who are the ultimate purchasers, about the qualities and attributes of the Systems – including the aforementioned advertising on Generac's website about the supposed quality of its products. *See supra*, at ¶¶ 4 and 24. Consumers who

19

install the Systems on their property must integrate pre-existing solar panel modules, must connect Internet to the Systems, and can operate their Systems through Generac's phone application. In turn, Generac is able to monitor consumers' Systems through the application or through the Internet connection to the System.

69.     Further, Generac issued warranties to Plaintiffs and putative Class Members as part of the sale of the Systems. For consumers with warranty claims, Generac represents that either it or one of its authorized service providers or certified installers will perform the repairs (*see supra*, at ¶ 27); otherwise, the Limited Warranty is null and void. Thus, the warranty was designed for and intended to benefit *only* the end consumers – here, Plaintiffs and putative Class Members.

70.     In any event, privity is not required here because Plaintiffs and putative Class Members were (and are) intended third-party beneficiaries of the Systems. The retailers were not intended to be the ultimate consumers of the Systems and have no rights under the Limited Warranty provided to Plaintiffs and putative Class Members when they purchased the Systems.

## GEORGIA PLAINTIFF'S FACTS

### *Plaintiff Kibert Basler's Facts*

71.     In or about March 2021, Ms. Kibert Basler was seeking to purchase a clean energy management system. She saw advertisements for the System and submitted a request for an appointment with PHS. PHS came to her home and she subsequently entered into an agreement to purchase the System on March 28, 2021. She paid approximately $53,768 for the parts and installation because she believed she was purchasing a premium energy system which, over time, would reduce her energy costs.

72.     In selecting the System, Ms. Kibert Basler relied on Generac's representations in its written materials as well as the statements made by Generac's authorized retailer, PHS. She

believed that she was purchasing a System of merchantable quality and that would work as intended and, specifically, that the System would lower her energy costs. As a reasonable consumer, she did not expect that defective Snaps would render the System useless.

73. Installation for Ms. Kibert Basler's System was finished on or about February 21, 2022. At all times, Ms. Kibert Basler exclusively used the System for its normal, intended, residential purposes. However, the System has not performed as expected and production has decreased outside normal fluctuations. As a result, Ms. Kibert Basler filed a complaint with the Better Business Bureau.

74. In or about July 2022, Ms. Kibert Basler's System started to experience errors due to her Snaps and, as a result, its performance decreased by half. But for the failure of her Snaps, Ms. Kibert Basler's System would have performed as expected.

75. Ms. Kibert Basler contacted PHS to repair her System, but it was unable to perform the required service.

76. Ms. Kibert Basler also contacted Generac, who informed her of four companies in Georgia who would provide authorized warranty service. Ms. Kibert Basler attempted to call each of them, but only one of the authorized warranty service providers returned her call. The business that returned Ms. Kibert Basler's call indicated that there was a backlog of warranty service requests for the Systems, that warranty service was not available, and that she should call back to schedule warranty service in several months. Despite the purported "availability" of replacement Snap components, Ms. Kibert Basler had and continues to have no way of purchasing or otherwise having the components installed on her System to repair the Defect.

77. In or about November 2022, Ms. Kibert Basler's System experienced additional errors, and her System has ceased functioning altogether.

78.     After she experienced underperformance of her System, Ms. Kibert Basler conducted online research and discovered that numerous other consumers had reported the same or similar instances of their Systems having errors and experiencing decreased performance.

79.     Because Generac unlawfully concealed the Defect from Ms. Kibert Basler before her purchase through the present, she did not suspect (and had no reason to suspect) that there was anything wrong with her System until it experienced errors and underperformed.

80.     Ms. Kibert Basler's System has not operated properly for the expected useful life of the System.  Had she known about the Defect, she would have either not purchased the System or would have paid less than she did.  Therefore, she did not receive the benefit of her bargain.

## ILLINOIS PLAINTIFF'S FACTS

### *Plaintiff Amend's Facts*

83.     In or about February 2022, Ms. Amend was seeking to purchase a clean energy management system.  At that time, she called PHS and subsequently entered into an agreement to purchase the System.  She paid approximately $81,000 for the parts and installation because she believed she was purchasing a premium energy system which, over time, would reduce her energy costs.

84.     In selecting the System, Ms. Amend relied on Generac's representations in its written materials as well as the statements made by Generac's authorized retailer, PHS.  She believed that she was purchasing a System of merchantable quality and that would work as intended and, specifically, that the System would lower her energy costs.  As a reasonable consumer, she did not expect that defective Snaps would render the System less productive or useless.

85.     The System was installed on or about April 19, 2022.  At all times, Ms. Amend exclusively used the System for its normal, intended, residential purposes.  However, the System has not performed as expected and production has decreased outside normal fluctuations.

86.     Shortly after installation, Ms. Amend's System started to experience errors and, as a result, its performance decreased.

87.     After she experienced underperformance of her System, Ms. Amend conducted online research and discovered that numerous other consumers had reported the same or similar instances of their Systems having errors and experiencing decreased performance.

88.     Because Generac unlawfully concealed the Defect from Ms. Amend before her purchase through the present, she did not suspect (and had no reason to suspect) that there was anything wrong with her System until it experienced errors and underperformed.

89.     Ms. Amend's System has not operated properly for the expected useful life of the System.  Had she known about the Defect, she would have either not purchased the System or would have paid less than she did.  Therefore, she did not receive the benefit of her bargain.

## INDIANA PLAINTIFF'S FACTS

### *Plaintiff Wheat's Facts*

90.     In or about November 2021, Ms. Wheat was seeking to purchase a clean energy management system.  At that time, she received an invitation to an informational dinner where the System was explained to her.  Around that time, a door-to-door salesperson from PHS came to her home and she subsequently entered into an agreement to purchase the System.  She paid approximately $75,945 for the parts and installation because she believed she was purchasing a premium energy system which, over time, would reduce her energy costs.

23

91.     In selecting the System, Ms. Wheat relied on Generac's representations in its written materials as well as the statements made by Generac's authorized retailer, PHS. She believed that she was purchasing a System of merchantable quality and that would work as intended and, specifically, that the System would lower her energy costs. As a reasonable consumer, she did not expect that defective Snaps would render the System less productive or useless.

92.     The System was installed on or around April 1, 2022. At all times, Ms. Wheat exclusively used the System for its normal, intended, residential purposes. However, the System has not performed as expected and production has decreased outside normal fluctuations.

93.     Within the first month of installation, the System experienced a decline in production. Ms. Wheat received an error involving her Snaps which reduced her electricity production to half its productive capacity.

94.     Thereafter, Ms. Wheat contacted PHS regarding service on her System. PHS confirmed with Ms. Wheat that her Snaps had indeed failed. But for the failure of her Snaps, Ms. Wheat's System would have performed as expected.

95.     PHS provided Ms. Wheat service on her System and removed her Snaps. However, the System continues to underperform her expectations.

96.     After she experienced underperformance from her System, Ms. Wheat conducted online research and discovered that numerous other consumers had reported the same or similar incidences of their Systems having errors and experiencing decreased performance.

97.     Because Generac unlawfully concealed the Defect from Ms. Wheat before her purchase through the present, she did not suspect (and had no reason to suspect) that there was anything wrong with her System until it experienced errors and underperformed.

98.     Ms. Wheat's System has not operated properly for the expected useful life of the System.  Had she known about the Defect, she would have either not purchased the System or would have paid less than she did.  Therefore, she did not receive the benefit of her bargain.

## KANSAS PLAINTIFF'S FACTS

*Plaintiff Donley's Facts*

99.     On or about February 18, 2022, Mr. Donley was seeking to purchase a clean energy management system.  He looked online for solar power systems and came across the System sold by PHS, and he subsequently entered into an agreement to purchase the System.  He paid approximately $75,084 for the parts and installation because he believed he was purchasing a premium energy system which, over time, would reduce his energy costs.

100.    In selecting the System, Mr. Donley relied on Generac's representations in its written materials as well as the statements made by Generac's authorized retailer, PHS.  He believed that he was purchasing a System of merchantable quality and that would work as intended and, specifically, that the System would lower his energy costs.  As a reasonable consumer, he did not expect that defective Snaps would render the System less productive or useless.

101.    The System was installed in or about April 2022.  However, the System has not performed as expected.  At no point has Mr. Donley's System functioned as expected and has no productive capacity.  Had his System functioned as expected, the Defect would have manifested because his System contains defective Snaps for which Generac has no non-defective replacement.

102.    Consequently, Mr. Donley conducted online research and discovered that numerous other consumers had reported the same or similar instances of their Systems having errors and experiencing decreased performance.

103.    Because Generac unlawfully concealed the Defect from Mr. Donley before his purchase through the present, he did not suspect (and had no reason to suspect) that there was anything wrong with his System until it underperformed.

104.    Mr. Donley's System has not operated properly for the expected useful life of the System. Had he known about the Defect, he would have either not purchased the System or would have paid less than he did. Therefore, he did not receive the benefit of his bargain.

## MICHIGAN PLAINTIFFS' FACTS

### *Plaintiff Herrington's Facts*

105.    On or about October 28, 2020, Ms. Herrington was seeking to purchase a clean energy management system. At that time, she called PHS and subsequently entered into an agreement to purchase the System. She paid approximately $48,765 for the parts and installation because she believed she was purchasing a premium energy system which, over time, would reduce her energy costs.

106.    In selecting the System, Ms. Herrington relied on Generac's representations in its written materials as well as the statements made by Generac's authorized retailer, PHS. She believed that she was purchasing a System of merchantable quality and that would work as intended and, specifically, that the System would lower her energy costs. As a reasonable consumer, she did not expect that defective Snaps would render the System less productive or useless.

107.    The System was installed on or about December 22, 2020. At all times, Ms. Herrington exclusively used the System for its normal, intended, residential purposes. However, the System has not performed as expected and production has decreased outside normal fluctuations.

108.    In or about June 2021, Ms. Herrington's System started to experience errors and, as a result, its performance decreased. In or about September 2021, Ms. Herrington received service on her System which required replacing her Snaps. Her System never performed as it did previously, even upon installation of new Snaps, and the System ceased performing in March 2022. She sought service on her System, which has never been completed, and she is still without a functioning System.

109.    After she experienced underperformance of her System, Ms. Herrington conducted online research and discovered that numerous other consumers had reported the same or similar instances of their Systems having errors and experiencing decreased performance.

110.    Because Generac unlawfully concealed the Defect from Ms. Herrington before her purchase through the present, she did not suspect (and had no reason to suspect) that there was anything wrong with her System until it experienced errors and underperformed.

111.    Ms. Herrington's System has not operated properly for the expected useful life of the System. Had she known about the Defect, she would have either not purchased the System or would have paid less than she did. Therefore, she did not receive the benefit of her bargain.

***Plaintiff Leon's Facts***

112.    On or about June 18, 2021, Mr. Leon was seeking to purchase a clean energy management system. He looked online for solar power systems and came across the System sold by PHS, and he subsequently entered into an agreement to purchase the System. He paid approximately $78,000 for the parts and installation because he believed he was purchasing a premium energy system which, over time, would reduce his energy costs.

113.    In selecting the System, Mr. Leon relied on Generac's representations in its written materials as well as the statements made by Generac's authorized retailer, PHS. Mr. Leon saw

27

advertisements for the System when he attended Detroit Lions games. He believed that he was purchasing a System of merchantable quality and that would work as intended and, specifically, that the System would lower his energy costs. As a reasonable consumer, he did not expect that defective Snaps would render the System less productive or useless.

114. The System was installed on or about September 9, 2021. At all times, Mr. Leon exclusively used the System for its normal, intended, residential purposes. However, the System has not performed as expected and production has decreased outside of expected reasonable fluctuations.

115. Within one month, Mr. Leon's System started to experience errors and, as a result, its performance decreased.

116. After he experienced underperformance from his System, Mr. Leon conducted online research and discovered that numerous other consumers had reported the same or similar instances of their Systems having errors and experiencing decreased performance.

117. Because Generac unlawfully concealed the Defect from Mr. Leon before his purchase through the present, he did not suspect (and had no reason to suspect) that there was anything wrong with his System until it experienced errors and underperformed.

118. Mr. Leon's System has not operated properly for the expected useful life of the System. Had he known about the Defect, he would have either not purchased the System or would have paid less than he did. Therefore, he did not receive the benefit of his bargain.

***Plaintiff Quednau's Facts***

119. In or about June 2020, Ms. Quednau was seeking to purchase a clean energy management system. At that time, she scheduled an appointment for a salesperson from PHS to come to her home and she subsequently entered into an agreement to purchase the System. She

paid approximately $57,000 for the parts and installation because she believed she was purchasing a premium energy system which, over time, would reduce her energy costs.

120. In selecting the System, Ms. Quednau relied on Generac's representations in its written materials as well as the statements made by Generac's authorized retailer, PHS. Ms. Quednau saw advertisements for the System when she attended Detroit Lions games. She believed that she was purchasing a System of merchantable quality and that would work as intended and, specifically, that the System would lower her energy costs. As a reasonable consumer, she did not expect that defective Snaps would render the System less productive or useless.

121. Ms. Quednau's System was installed on her home in July 2020. At all times, Ms. Quednau exclusively used the System for its normal, intended, residential purposes. However, the System has not performed as expected and production has decreased outside of expected reasonable fluctuations.

122. In or about August 2022, Ms. Quednau received an error from her System related to her Snaps. She repeatedly attempted to have receive warranty service but was unable to have a technician repair her system. In or about October 2022, she was able to contact Generac who indicated to her that she would need her Snaps replaced, but she has been unable to schedule service to do so.

123. After she experienced underperformance from her System, Ms. Quednau conducted online research and discovered that numerous other consumers had reported the same or similar instances of their Systems having errors and underperforming.

124. Because Generac unlawfully concealed the Defect from Ms. Quednau before her purchase and through the present, she did not suspect (and had no reason to suspect) that there was anything wrong with her System until it experienced errors and underperformed.

125.    Ms. Quednau's System has not operated properly for the expected useful life of the System.  Had she known about the Defect, she would have either not purchased the System or would have paid less than she did.  Therefore, she did not receive the benefit of her bargain.

### MISSOURI PLAINTIFFS' FACTS

*Plaintiff Goeke's Facts*

126.    In or about March 2020, Ms. Goeke was seeking to purchase a clean energy management system.  At that time, she called PHS and subsequently entered into an agreement to purchase the System.  She paid approximately $52,000 for the parts and installation because she believed she was purchasing a premium energy system which, over time, would reduce her energy costs.

127.    In selecting the System, Ms. Goeke relied on Generac's representations in its written materials as well as the statements made by Generac's authorized retailer, PHS.  She believed that she was purchasing a System of merchantable quality and that would work as intended and, specifically, that the System would lower her energy costs.  As a reasonable consumer, she did not expect that defective Snaps would render the System less productive or useless.

128.    The System was installed on or about March 2020.  At all times, Ms. Goeke exclusively used the System for its normal, intended, residential purposes.  However, the System has not performed as expected and production has decreased outside normal fluctuations.

129.    In or about June 2021, Ms. Goeke's System started to experience errors with her Snaps and, as a result, its performance ceased.  She received replacements and, for a time, her System performed as expected.

30

130.    In or about August 2022, the System failed to perform again due to errors with the Snaps.  Ms. Goeke had all of her Snaps replaced as a result.  Despite receiving new Snaps, her System is already experiencing a decline in performance.

131.    After she experienced underperformance of her System, Ms. Goeke conducted online research and discovered that numerous other consumers had reported the same or similar instances of their Systems having errors and experiencing decreased performance.

132.    Because Generac unlawfully concealed the Defect from Ms. Goeke before her purchase through the present, she did not suspect (and had no reason to suspect) that there was anything wrong with her System until it experienced errors and underperformed.

133.    Ms. Goeke's System has not operated properly for the expected useful life of the System.  Had she known about the Defect, she would have either not purchased the System or would have paid less than she did.  Therefore, she did not receive the benefit of her bargain.

*Plaintiff Vincent's Facts*

134.    In or about June 2022, Ms. Vincent was seeking to purchase a clean energy management system.  At that time, she called PHS and subsequently entered into an agreement to purchase the System.  She paid approximately $72,000 for the parts and installation because she believed she was purchasing a premium energy system which, over time, would reduce her energy costs.

135.    In selecting the System, Ms. Vincent relied on Generac's representations in its written materials as well as the statements made by Generac's authorized retailer, PHS.  Ms. Vincent reviewed literature online and received multiple quotes for different solar systems.  She believed that she was purchasing a System of merchantable quality and that would work as intended and, specifically, that the System would lower her energy costs.  As a reasonable

31

consumer, she did not expect that defective Snaps would render the System less productive or useless.

136.    The System was installed in or about September 2022.  However, the System has not performed as expected.  At no point has Ms. Vincent's System functioned as expected and has no productive capacity.  Had her System functioned as expected, the Defect would have manifested because her System contains defective Snaps for which Generac has no non-defective replacement.

137.    After she experienced underperformance of her System, Ms. Vincent conducted online research and discovered that numerous other consumers had reported the same or similar instances of their Systems having errors and experiencing decreased performance.

138.    Because Generac unlawfully concealed the Defect from Ms. Vincent before her purchase through the present, she did not suspect (and had no reason to suspect) that there was anything wrong with her System until it experienced errors and underperformed.

139.    Ms. Vincent's System has not operated properly for the expected useful life of the System.  Had she known about the Defect, she would have either not purchased the System or would have paid less than she did.  Therefore, she did not receive the benefit of her bargain.

## PENNSYLVANIA PLAINTIFFS' FACTS

### *Plaintiff Fawcett's Facts*

140.    On or about November 24, 2020, Mr. Fawcett was seeking to purchase a clean energy management system.  At that time, a door-to-door salesperson from PHS came to his home and he subsequently entered into an agreement to purchase the System.  He paid approximately $48,568.00 for the parts and installation because he believed he was purchasing a premium energy system which, over time, would reduce his energy costs.

32

141.    In selecting the System, Mr. Fawcett relied on Generac's representations in its written materials as well as the statements made by Generac's authorized retailer, PHS. He believed that he was purchasing a System of merchantable quality and that would work as intended and, specifically, that the System would lower his energy costs. As a reasonable consumer, he did not expect that defective Snaps would render the System less productive or useless.

142.    The System was installed in or about December 2020. At all times, Mr. Fawcett exclusively used the System for its normal, intended, residential purposes. However, the System has not performed as expected and production has decreased outside of expected reasonable fluctuations due to errors related to the Defect.

143.    Beginning in July through November 2021, energy production levels declined until they reached zero. In or about December 2021 and January 2022, Mr. Fawcett had service technicians repair "PV Link" issues, which involved Internet connectivity issues and the Snaps.

144.    Mr. Fawcett required repair service again in April 2022, which at the time was explained as another repair to the "PV Links." Mr. Fawcett received SnapRS801A Snaps due to the Defect with his original Snaps.

145.    In or about July 2022, Mr. Fawcett's System again started to experience errors and, as a result, its performance declined. Mr. Fawcett took immediate action and requested service on his System. Mr. Fawcett was provided SnapRS802 Snaps for his System. The 802 Snaps provided relief, albeit brief, as the System performed as expected in August 2022 and then production declined again in September 2022, by nearly 33% and in a similar pattern as to when his Snaps had previously failed. In October 2022, Generac declined to provide additional repair service after the failure of 802 Snaps. Because Mr. Fawcett already has SnapRS802 Snaps on his System, Generac has no non-defective replacement parts for his System.

33

146.    After he experienced underperformance from his System, Mr. Fawcett conducted online research and discovered that numerous other consumers had reported the same or similar instances of their Systems having errors and experiencing decreased performance.

147.    Because Generac unlawfully concealed the Defect from Mr. Fawcett before his purchase and through the present, he did not suspect (and had no reason to suspect) that there was anything wrong with his System until it experienced errors and underperformed.

148.    Mr. Fawcett's System has not operated properly for the expected useful life of the System. Had he known about the Defect, he would have either not purchased the System or would have paid less than he did. Therefore, he did not receive the benefit of his bargain.

***Plaintiff Figueroa's Facts***

149.    On or about April 12, 2022, Mr. Figueroa was seeking to purchase a clean energy management system. He looked online for solar power systems and came across the System sold by PHS, and he subsequently entered into an agreement to purchase the System. He paid approximately $82,499 for the parts and installation because he believed he was purchasing a premium energy system which, over time, would reduce his energy costs.

150.    In selecting the System, Mr. Figueroa relied on Generac's representations in its written materials as well as the statements made by Generac's authorized retailer, PHS. He believed that he was purchasing a System of merchantable quality and that would work as intended and, specifically, that the System would lower his energy costs. As a reasonable consumer, he did not expect that defective Snaps would render the System less productive or useless.

151.    The System was installed in or about May 2022. At all times, Mr. Figueroa exclusively used the System for its normal, intended, residential purposes. However, the System

34

has not performed as expected and production has decreased outside of expected reasonable fluctuations.

152.    Shortly after installation, Mr. Figueroa's System started to experience errors and, as a result, its performance decreased.

153.    After he experienced underperformance from his System, Mr. Figueroa conducted online research and discovered that numerous other consumers had reported the same or similar instances of their Systems having errors and experiencing decreased performance.

154.    Because Generac unlawfully concealed the Defect from Mr. Figueroa before his purchase through the present, he did not suspect (and had no reason to suspect) that there was anything wrong with his System until it experienced errors and underperformed.

155.    Mr. Figueroa's System has not operated properly for the expected useful life of the System.  Had he known about the Defect, he would have either not purchased the System or would have paid less than he did.  Therefore, he did not receive the benefit of his bargain.

*Plaintiff Hemphill's Facts*

156.    On or about October 1, 2021, Mr. Hemphill was seeking to purchase a clean energy management system.  He looked online for solar power systems and came across the System sold by PHS, and he subsequently entered into an agreement to purchase the System.  He paid approximately $79,201 for the parts and installation because he believed he was purchasing a premium energy system which, over time, would reduce his energy costs.

157.    In selecting the System, Mr. Hemphill relied on Generac's representations in its written materials as well as the statements made by Generac's authorized retailer, PHS.  He believed that he was purchasing a System of merchantable quality and that would work as intended

35

and, specifically, that the System would lower his energy costs. As a reasonable consumer, he did not expect that defective Snaps would render the System less productive or useless.

158. The System was installed on or about November 16, 2021. At all times, Mr. Hemphill exclusively used the System for its normal, intended, residential purposes. However, the System has not performed as expected and production has decreased outside of expected reasonable fluctuations.

159. In or about June 2022, Mr. Hemphill's System started to experience errors and indicated that there was an issue with the Snaps and, as a result, its performance declined. On or around August 22, 2022, Mr. Hemphill received replacement Snaps components which were installed on his System. However, since that time, the System's performance has been less than expected and has continued to decrease since the repair.

160. After he experienced underperformance from his System, Mr. Hemphill conducted online research and discovered that numerous other consumers had reported the same or similar instances of their Systems having errors and experiencing decreased performance.

161. Because Generac unlawfully concealed the Defect from Mr. Hemphill before his purchase through the present, he did not suspect (and had no reason to suspect) that there was anything wrong with his System until it experienced errors and underperformed.

162. Mr. Hemphill's System has not operated properly for the expected useful life of the System. Had he known about the Defect, he would have either not purchased the System or would have paid less than he did. Therefore, he did not receive the benefit of his bargain.

## TENNESSEE PLAINTIFF'S FACTS

*Plaintiff Edwards' Facts*

163.     On or about May 30, 2020, Mr. Edwards was seeking to purchase a clean energy management system.  He looked online for solar power systems and came across the System sold by PHS, and he subsequently entered into an agreement to purchase the System.  He paid approximately $56,256 for the parts and installation because he believed he was purchasing a premium energy system which, over time, would reduce his energy costs.

164.     In selecting the System, Mr. Edwards relied on Generac's representations in its written materials as well as the statements made by Generac's authorized retailer, PHS.  He believed that he was purchasing a System of merchantable quality and that would work as intended and, specifically, that the System would lower his energy costs.  As a reasonable consumer, he did not expect that defective Snaps would render the System less productive or useless.

165.     The System was installed in or about September 2020.  At all times, Mr. Edwards exclusively used the System for its normal, intended, residential purposes.  However, the System has not performed as expected and production has decreased outside of expected reasonable fluctuations.

166.     In or about June 2021, Mr. Edwards' System started to experience errors and, as a result, its performance decreased.  After requesting service on his System, Mr. Edwards received 801A Snaps for his System.  However, this repair worked for only so long, and his System had a gradual decline in performance until it ceased performing altogether in July 2022.  Mr. Edwards requested Service on his System, and he received 802 Snaps in October 2022.  Despite this fix, the System continues to underperform his expectations.

167.     After he experienced underperformance from his System, Mr. Edwards conducted online research and discovered that numerous other consumers had reported the same or similar instances of their Systems having errors and experiencing decreased performance.

168.     Because Generac unlawfully concealed the Defect from Mr. Edwards before his purchase through the present, he did not suspect (and had no reason to suspect) that there was anything wrong with his System until it experienced errors and underperformed.

169.     Mr. Edwards' System has not operated properly for the expected useful life of the System.  Had he known about the Defect, he would have either not purchased the System or would have paid less than he did.  Therefore, he did not receive the benefit of his bargain.

## VIRGINIA PLAINTIFF'S FACTS

### *Plaintiff Morse's Facts*

170.     On or about February 20, 2021, Ms. Morse was seeking to purchase a clean energy management system.  At that time, a door-to-door salesperson from PHS came to her home and she subsequently entered into an agreement to purchase the System.  She paid approximately $74,196 for the parts and installation because she believed she was purchasing a premium energy system which, over time, would reduce her energy costs.

171.     In selecting the System, Ms. Morse relied on Generac's representations in its written materials as well as the statements made by Generac's authorized retailer, PHS.  She believed that she was purchasing a System of merchantable quality and that would work as intended and, specifically, that the System would lower her energy costs.  As a reasonable consumer, she did not expect that defective Snaps would render the System less productive or useless.

172.     The System was installed on or about March 2021.  At all times, Ms. Morse used the System for its normal, intended, residential purposes.  However, the System has not performed as expected and production has decreased outside of expected reasonable fluctuations.

173.    In or around May 2022, Ms. Morse's System indicated that it was experiencing errors related to her Snaps and production ceased.  She eventually received service on her System in or around August 2022, yet her System is already underperforming.

174.    After she experienced underperformance from her System, Ms. Morse conducted online research and discovered that numerous other consumers had reported the same or similar instances of their Systems having errors and experiencing decreased performance.

175.    Because Generac unlawfully concealed the Defect from Ms. Morse before her purchase through the present, she did not suspect (and had no reason to suspect) that there was anything wrong with her System until it experienced errors and decreased performance.

176.    Ms. Morse's System has not operated properly for the expected useful life of the System.  Had she known about the Defect, she would have either not purchased the System or would have paid less than she did.  Therefore, she did not receive the benefit of her bargain.

### GENERAC'S ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF THE DEFECT

177.    Generac knew or should have known when it sold the Systems to the public, and during warranty communications, that the Systems suffered from the Defect, and that the Defect caused the performance of the Systems to decrease and would present a safety risk, which might result in property damage.

178.    Plaintiffs put Generac on notice of the Defect in their Systems when they sought installation of the RS802 Snap models, as described *supra*.

179.    Generac's knowledge of the Defect is established through years of consumer and dealer complaints, some of which are publicly available on the Internet, and include uniform complaints about the Systems experiencing errors and decreased performance during normal,

39

intended, residential use, as well as through warranty claims. The number of complaints and consistency of their descriptions either alerted or should have alerted Generac to the Defect.

180. Generac's knowledge of the Defect is established through complaints to the Better Business Bureau and Generac's resulting responses to those complaints.

181. Generac's knowledge of the Defect is established through its communications directly to consumers related to the Snaps.

182. Generac's knowledge of the Defect is established through its access to consumers' Systems via the Generac phone application and Internet connection, whereby it can monitor each consumers' System functionality. Accordingly, Generac knew or should have known about the Defect as soon as it manifested.

183. The outgrowth of the consumer complaints and warranty claims were the various updates to the Snaps released by Generac. First, in or about August 2021, Generac released firmware updates in an effort to resolve the Defect. Then, in late 2021, Generac released the new RS801A Snap model to replace the RS801 Snaps, which were defective. Finally, in June 2022, Generac announced it would "honor" its Limited Warranty and released the RS802 Snap Model as a result of discussions it had with its retailers, namely PHS. However, despite its knowledge of the Defect, at no point did Generac reveal *why* it was releasing the new components, nor did it disclose that the Systems contained the Defect or cease its active concealment of the Defect from consumers.

184. Consumer complaints about the Defect are available on Generac's website. For example, LarryS describes a problem with "the Snaps"[36]:

---

[36] *PWRcell*, Generac, https://www.generac.com/pwrcell (last visited Sept. 27, 2022).

 3 / 5

**My system was installed 1st weel of December**

February 25, 2022



LarryS
from Tallahassee State: FL - Florida Age: Over 65

Our system with battery backup, was installed through Sanctity Solar the first week of December. (Contract was signed June 2021.)
However, it has never produced electricity. It appears that there is a problem with the Snaps.
But no one really knows as no one from Generic
nor Sanctity Solar LLC has cared enough to check out system to ensure that is the problem. I asked about when warranty starts. Generic said for ME to determine if
there is a part under warranty that has malfunctioned.
I do have 2 Generac portable generators that I have had for years that always start when I needed them. Only had to replace a battery on the one with electric start.
Thus, I know that it makes great products. I just need my solar to start working.

✓ Yes, I recommend this product.

Features

▮▮▮▯▯ 3 / 5

Appearance

▮▮▮▮▮ 5 / 5

Quality

▮▮▮▯▯ 3 / 5

Value for the Price

▮▮▮▯▯ 3 / 5

184.    Similarly, on a public Facebook group dedicated to the "Generac PWRcell Systems,

Battery Storage, Home Energy, Energy Storage," there are hundreds of complaints about the

Defect.  For example, on or about March 27, 2022, a consumer posted the following:



**Mark H White**
I don't know on the lawsuit issue.  But, my new system installed in Jan 2022 has one of 3 strings not producing .  never has from day one.  My dealer says it might be a snap rs or pv link.  but won't come to check the system because they say they have no parts .   Generac needs to be held accountable for warrantee issues for sure

26w    Like    Reply

However, consumer complaints did not end upon the release and installation of some RS802 Snap

model for consumers.  For example:



**Richard Takacs**

Sep 14 · 🌐

I have had a Generac system for a year and half. Nothing but problems. After 802s were installed thought problems were solved. Unfortunately, one bank broke on Jul 26. Installer claims it is not a 802 problem, but has failed to send a crew down for repairs. Alot of promising and maybe"next" week. Are all Generac sub contractors this unreliable? I think a law suit will be the only way to get results.

 7

8 comments

One consumer complained on or about September 20, 2022 that he had to have over 150 replacement Snaps installed, and his System still does not function properly:



**Daniel Haak**

My generac solar system has had compnent failure again and again. 56 panels 2 inverters and 3 cell battery. They have replaced 6 inverters. 3 of which exploded, over 150 snapRS connectors. A good number of which where burned all the way through and several pv links. My system is still having problems. Total ownership 25 months, time 100% operational 5%. Generac even had there own techs here for the last 2 sets of snap replacements. And still having issues. Some of it may be installers but the product is also terrible.

1w   Like   Reply

Recently, consumers have virtually lost all hope that Generac will be able to resolve the Defect.

For example, on or about September 13, 2022, a consumer posted the following:



**Steven Erat**
First problem I had ended up being the 1st gen SnapRS units, which were replaced by installer/generac with the 2nd gen.

Second type of problem was the PVRSS Lockout Error on 1 of 4 strings (each string has 8 panels). Installer "fixed" that problem 4 times now. Each time they fixed it, the problem returned. Today was the 4th fix, so I'm waiting to see how long it holds. Effectively since operation began, there has been at least 1 string out of commission at any given time. That's a 25% reduction in power generation since the system was turned on.

I have little to no hope of Generac fixing this problem for the long term.

Given the amount that consumers have paid for the Systems, it is clear that they do not believe they received the benefit of their bargain:



**Aaron Rutledge**
Sep 4 · 🌐

Are snaps are still busted and pink energy aka power home solar is putting it on generac. I'm a customer and it's disgusting what we and many people are going through. Thanks for a hunk of stuff

👍 4                              40 comments  1 share

👍 Like            💬 Comment            ➤ Share

185.    The exemplar posts above represent only a fraction of the countless online complaints about the System on Facebook, which, in turn, are only a fraction of the total complaints posted on the Internet or made directly to Generac about the Defect.  Indeed, some of the consumers who posted the complaints above indicate that they also contacted Generac.

186.    Upon information and belief, Generac also received complaints from authorized retailers and certified installers regarding the Defect, and specifically from PHS.

187.    Upon information and belief, Generac filed a report with the Consumer Product Safety Commission ("CPSC") regarding the Defect but did not issue a recall and continued to conceal the Defect from consumers.

188.    Upon information and belief, Generac admits that the failure rate of the Snaps is at least 50%, thereby demonstrating that Generac knows or should know of the Defect.

189.    Despite its knowledge about the Defect, Generac did not remedy or eliminate the Defect or remove the Systems from the stream of commerce.  Nor did Generac contact consumers

45

to disclose the Defect, even though Generac was aware of the Defect. Instead, Generac improperly denied warranty claims or replaced the defective Snaps with equally defective components, which did not remedy the Defect.

190.    Generac has a duty to disclose the Defect and not to conceal the Defect from Plaintiffs and putative Class Members. Generac's failure to disclose, or active concealment of, the serious safety Defect places Plaintiffs and putative Class Members at risk of personal injury and/or property damage.

191.    Generac is currently still selling the Systems, concealing the Defect, failing to notify consumers of the Defect, and failing to recall the Systems.

192.    Moreover, Generac continues to falsely represent through written warranties that the Systems are free from Defect, are of merchantable quality, and will perform dependably for years.

193.    When corresponding with consumers, Generac does not disclose that the Systems suffer from the Defect. As a result, reasonable consumers, including Plaintiffs and putative Class Members, purchased and used – and continue to purchase and use – the Systems in their homes even though it is unsafe to do so.

194.    When Generac replaces components, it fails to disclose the known Defect and it replaces the defective Snaps with equally defective Snaps, which do not remedy the Defect.

195.    Had Plaintiffs and putative Class Members, and the consuming public, known that the Systems were defective, posed an unreasonable risk of harm to themselves and their property, and would cause damage, they would not have purchased them.

46

196.    Generac has wrongfully placed on Plaintiffs and putative Class Members the burden, expense, and difficulty involved in discovering the Defect, repairing and replacing the Snaps (often multiple times), and paying for the cost of damages caused by the Defect.

197.    Generac had notice of these claims at least as of November 21, 2022, when Plaintiffs sent written notice to Defendant via certified mail through the United States Postal Service demanding corrective actions for the unfair or deceptive acts described *supra*. Each Plaintiff also provided notice of their claims as of the date of this filing by way of this Class Action Complaint. Defendant had further notice of Plaintiffs' claims by monitoring Plaintiffs and putative Class Members' Systems via their applications and connection to the Internet. Furthermore, Plaintiffs need only provide notice to the seller, not the manufacturer, which upon information and belief each Plaintiff has and otherwise would be unable to do as a result of PHS being defunct. Notwithstanding Plaintiffs' provisions of notice, any such notice is futile as there is no non-defective replacement component to cure the Defect alleged herein.

198.    Generac had notice and denied warranty claims for Plaintiffs Kibert Basler, Herrington, Quednau, and Fawcett. Plaintiff Kibert Basler was unable to schedule service on her System because each authorized dealer provided to her through Generac declined to service her System. Plaintiff Herrington scheduled warranty service through PHS which remains incomplete and unable to be completed. Plaintiff Quednau sought service on her System but has not been able to locate an authorized dealer who would provide service. Plaintiff Fawcett received an inspection of his System, but the technician would not look at his Snaps.

**TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

199.    Generac had actual awareness for years that the Systems contain a Defect that causes the Snaps to fail.

47

200. Although Generac was aware of the Defect, it took no steps to warn Plaintiffs or putative Class Members of such Defect and the dangers it poses.

201. At least by 2021, if not earlier, Generac had received reports of Snaps failing due to the Defect.

202. Generac had reportedly attempted to resolve the Defect, first through firmware updates and then through new Snap models, without notifying consumers of the Defect or the risks associated with it.

203. To date, Generac has not issued a recall, warned consumers, or taken any other affirmative steps to correct the Defect. Nor has Generac taken steps to alert consumers about the Defect.

204. Despite its knowledge, Generac has fraudulently concealed the fact that the Systems were and are defective, even though it has a duty to disclose the Defect.

205. Generac made affirmative misrepresentations to consumers during the design, manufacture, supply, distribution, and/or sale of the Systems, including that the Systems were free from defects.

206. Generac made affirmative representations to Plaintiffs and putative Class Members during warranty claims and other correspondence with consumers lodging complaints, including that their problems with the Systems have been resolved. Such representations were made in an effort to persuade consumers to accept replacement parts, including replacement Snaps or firmware updates, as supposed remedies.

207. At all times, Generac concealed that the Systems and any remedial measures taken were defective.

208. Generac's concealment was material to Plaintiffs and putative Class Members' decisions to purchase the Systems. Generac's concealment was knowing, and Generac intended to mislead Plaintiffs and putative Class Members into relying upon it. Accordingly, Plaintiffs and putative Class Members relied upon Generac's concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

209. The uniform Defect in the design and/or manufacture in the Systems was not detectible to Plaintiffs or putative Class Members.

210. Generac actively and intentionally concealed the existence of the Defect and failed to inform Plaintiffs or putative Class Members of the existence of the Defect at all times, including when they contacted Generac about problems with their Systems. Accordingly, Plaintiffs and putative Class Members' lack of awareness was not attributable to a lack of diligence on their part.

211. Generac's statements, words, and acts were made for the purpose of suppressing the truth that the Systems and replacements were defective.

212. Generac concealed the Defect for the purpose of delaying Plaintiffs and putative Class Members from bringing a lawsuit to recover their damages.

213. As a result of Generac's active concealment of the Defect and/or failure to inform Plaintiffs and putative Class Members of the Defect, any applicable statutes of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Generac is estopped from relying on any statutes of limitations in light of its active concealment of the defective nature of the Systems.

214. Further, the causes of action alleged herein did not occur until Plaintiffs and putative Class Members discovered that their Systems had the Defect. Plaintiffs and putative Class Members had no realistic ability to discern that the Systems were defective until they learned of

the existence of the Defect.  In either event, Plaintiffs and putative Class Members had no reason to discover their causes of action because of Generac's active concealment of the true nature of the Defect.

## FED. R. CIV. P. 9(b) ALLEGATIONS
### (Affirmative and By Omission)

215.    Although Generac is in the best position to know what content is placed on its website and in marketing materials during the relevant timeframe, to the extent necessary, Plaintiffs and putative Class Members satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

216.    **WHO**: Generac made material misrepresentations and/or omissions of fact through its website representations, warranties, owner's manuals, marketing, labeling, packaging statements and representations made by employees receiving warranty claims, which include statements such as that the Systems were not defective, were of high-quality, and were suitable for their purpose of safely and reliably managing electricity.

217.    **WHAT**: Generac's conduct here was, and continues to be, fraudulent because it omitted and concealed that the Systems are (a) defective, in that the Snaps overheat, melt, explode, or otherwise malfunction which substantially diminishes the performance of the Systems; (b) are not of high-quality; (c) could present a safety hazard when used as intended; and (d) could fail prior to the completion of their expected useful life.  Generac's employees made affirmative representations to Plaintiffs and putative Class Members regarding the same qualities.  Further, Generac's conduct deceived Plaintiffs and putative Class Members into believing that the Systems are not defective, are high-quality, are safe to use, and will last at least as long as the full duration of their expected useful life.  Generac knew or should have known this information is material to

50

reasonable consumers, including Plaintiffs and putative Class Members, in making their purchasing decisions, yet it omits any warning that the Systems suffer from the Defect.

218. **WHEN**: The material misrepresentations and/or omission detailed herein were made prior to and available at the time Plaintiffs and putative Class Members performed research on the Systems to gather information that would aid them in selecting the best energy system to purchase; prior to and at the time Plaintiffs and putative Class Members purchased the Systems; prior to and at the time Plaintiffs and putative Class Members made claims about the Defect; and continuously throughout the applicable Class period.

219. **WHERE**: Generac's material misrepresentations and/or omissions were made on its website(s), through marketing materials, in warranties, in user manuals, as well as through statements made by its employees.

220. **HOW**: Generac made misrepresentations and/or failed to disclose material facts regarding the true nature of the Systems as well as the safety risks of normal use of the Systems in written form, electronic form, or conventional hardcopy form, as well as verbally through statements made by its employees.

221. **WHY**: Generac made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiffs, putative Class Members, and all reasonable consumers to purchase and/or pay for the Systems, the effect of which was that Generac profited by selling the Systems to many thousands of consumers.

222. **INJURY**: Plaintiffs and putative Class Members purchased or paid more for the Systems when they otherwise would not have absent Generac's misrepresentations and/or omissions. Further, the Systems continue to pose unreasonable safety risks of personal injury and

51

damage to property, and cause consumers to incur unnecessary and unreasonable out-of-pocket expenses when the Defect manifests.

## CLASS ACTION ALLEGATIONS

223.    Plaintiffs brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of themselves and the members of the following proposed nationwide class ("Nationwide Class"):

**During the fullest period allowed by law, all persons who purchased the Generac PWRcell system in the United States within the applicable statute of limitations, until the date notice is disseminated.**

224.    Plaintiff Kibert Basler brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of herself and the members of the following subclass ("Georgia Subclass"):

**During the fullest period allowed by law, all persons who purchased the Generac PWRcell system in the State of Georgia within the applicable statute of limitations, until the date notice is disseminated.**

225.    Plaintiff Amend brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of herself and the members of the following subclass ("Illinois Subclass"):

**During the fullest period allowed by law, all persons who purchased the Generac PWRcell system in the State of Illinois within the applicable statute of limitations, until the date notice is disseminated.**

226.    Plaintiff Wheat brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of herself and the members of the following subclass ("Indiana Subclass"):

**During the fullest period allowed by law, all persons who purchased the Generac PWRcell system in the State of Indiana within the applicable statute of limitations, until the date notice is disseminated.**

52

227. Plaintiff Donley brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of himself and the members of the following subclass ("Kansas Subclass"):

> **During the fullest period allowed by law, all persons who purchased the Generac PWRcell system in the State of Kansas within the applicable statute of limitations, until the date notice is disseminated.**

228. Plaintiffs Herrington, Leon, and Quednau bring this action individually and as representatives of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of themselves and the members of the following subclass ("Michigan Subclass"):

> **During the fullest period allowed by law, all persons who purchased the Generac PWRcell system in the State of Michigan within the applicable statute of limitations, until the date notice is disseminated.**

229. Plaintiffs Goeke and Vincent bring this action individually and as representatives of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of themselves and the members of the following subclass ("Missouri Subclass"):

> **During the fullest period allowed by law, all persons who purchased the Generac PWRcell system in the State of Missouri within the applicable statute of limitations, until the date notice is disseminated.**

230. Plaintiffs Fawcett, Figueroa, and Hemphill bring this action individually and as representatives of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of themselves and the members of the following subclass ("Pennsylvania Subclass"):

> **During the fullest period allowed by law, all persons who purchased the Generac PWRcell system in the State of Pennsylvania within the applicable statute of limitations, until the date notice is disseminated.**

231.    Plaintiff Edwards brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of himself and the members of the following subclass ("Tennessee Subclass"):

> **During the fullest period allowed by law, all persons who purchased the Generac PWRcell system in the State of Tennessee within the applicable statute of limitations, until the date notice is disseminated.**

232.    Plaintiff Morse brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of herself and the members of the following subclass ("Virginia Subclass"):

> **During the fullest period allowed by law, all persons who purchased the Generac PWRcell system in the State of Virginia within the applicable statute of limitations, until the date notice is disseminated.**

233.    Specifically excluded from these definitions are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.  Plaintiffs reserve the right to amend the Class definition as necessary.

234.    **Numerosity:** The Members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is presently unknown, it likely consists of at least thousands of people throughout the United States, as well as in Georgia, Illinois, Indiana, Kansas, Michigan, Missouri, Pennsylvania, Tennessee, and Virginia. The number of Class Members can be determined by sales information and other records. Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity.  The Class is readily identifiable from information and records in the possession of Defendant.

54

235. **Typicality:** The claims of the representative Plaintiffs are typical in that Plaintiffs, like all Class Members, were impacted by the Defect. Plaintiffs and putative Class Members purchased the Systems with the Defect, which pose a safety risk of personal injury and damage to property. In addition, Generac's misconduct is common to all putative Class Members because Defendant has engaged in systematic deceptive and fraudulent behavior that was deliberate and results in the same injury to all Class Members.

236. **Commonality:** Common questions of law and fact exist as to all Members of the Class. These questions predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such common legal or factual questions include, *inter alia*:

  a. Whether the Systems are defective;

  b. Whether the Systems are defectively designed and/or manufactured;

  c. Whether Generac knew or reasonably should have known about the Defect prior to distributing the Systems to Plaintiffs and putative Class Members;

  d. Whether Generac concealed from and/or failed to disclose to Plaintiffs and putative Class Members the Defect in the Systems;

  e. Whether Generac knew or reasonably should have known about the Defect after distributing the Systems to Plaintiffs and putative Class Members;

  f. Whether Generac breached the implied warranty of merchantability;

  g. Whether Generac breached express warranties relating to the Systems;

  h. Whether Generac's Limited Warranty is unconscionable;

  i. Whether Generac should be ordered to disgorge all or part of the ill-gotten profits it received from the sale of the defective Systems;

  j. Whether Plaintiffs and putative Class Members are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages;

55

k.  Whether Plaintiffs and putative Class Members either paid a premium for the Systems that they would not have paid but for Generac's false representations or would not have purchased them at all;

l.  Whether Plaintiffs and putative Class Members are entitled to injunctive, declaratory, or other equitable relief; and

m.  Whether Generac engaged in unfair, unconscionable, or deceptive trade practices by selling and/or marketing defective Systems.

237.  **Adequate Representation:** Plaintiffs will fairly and adequately protect the interests of putative Class Members. They have no interests antagonistic to those of putative Class Members. Plaintiffs retained attorneys experienced in the prosecution of class actions, including consumer product cases, and Plaintiffs intend to prosecute this action vigorously.

238.  **Injunctive/Declaratory Relief:** The elements of Rule 23(b)(2) are met. Generac will continue to commit the unlawful practices alleged herein, and Plaintiffs and putative Class Members will continue to be deceived by Generac's misrepresentations and omissions and unknowingly be exposed to the risk of harm associated with the Defect in the Systems. Generac has acted and refused to act on grounds that apply generally to the Class, such that final injunctive relief, public injunctive relief, and corresponding declaratory relief are appropriate respecting the Class as a whole. Injunctive relief is necessary in this action.

239.  **Predominance and Superiority:** Plaintiffs and putative Class Members have all suffered and will continue to suffer risk of harm and damages as a result of Generac's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. The likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources will be unnecessarily depleted by resolution of individual claims. Joinder on an

individual basis of hundreds or thousands of claimants in one suit would be impractical or impossible. Individualized rulings and judgments could result in inconsistent relief for similarly situated Plaintiffs.

240. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

241. Generac has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class appropriate.

242. Plaintiffs reallege and incorporate by reference all of the proceeding paragraphs and allegations of this Class Action Complaint, including the factual allegations, tolling allegations, and class action allegations, as though fully set forth in each of the following Claims for Relief ("Counts") asserted on behalf of the Classes.

<u>COUNT I</u>
**Breach of Implied Warranty**
**(On Behalf of the Named Plaintiffs and the Nationwide Class and,**
**In the Alternative, Each State Subclass)**

243. Plaintiffs hereby adopt and incorporate by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

244. Generac is a merchant and was at all relevant times involved in the manufacturing, distributing, warranting, and/or selling of the Systems.

245. The Systems are goods within the relevant laws and Generac knew or had reason to know of the specific use for which the Systems, as goods, were purchased.

246. The implied warranty of merchantability included with the sale of each System means that Generac warranted that the Systems would be fit for the ordinary purposes for which the Systems were used and sold, and were not otherwise injurious to consumers, that the Systems

would pass without objection in the trade, be of fair and average quality, and conform to the promises and affirmations of fact made by Generac. This implied warranty of merchantability is part of the basis for the benefit of the bargain between Generac, and Plaintiffs and putative Class Members.

247. Generac breached the implied warranty of merchantability because the Systems are not fit for their ordinary purpose of safely and reliably managing electricity because, *inter alia*, the Systems contain the Defect, which ceases or decreases performance of the Systems. Therefore, the Systems are not fit for their particular purpose of safely and reliably managing electricity.

248. The problems associated with the Defect are safety risks such that the Systems do not provide safe reliable electricity management, and therefore, there is a breach of the implied warranty of merchantability.

249. Generac's warranty expressly applies to the original purchaser and any succeeding owner of the Systems on the original purchasing site, creating privity between Generac on the one hand, and Plaintiffs and putative Class Members on the other.

250. Nonetheless, privity is not required because Plaintiffs and putative Class Members are the intended beneficiaries of Generac's warranties and its sales through retailers. Generac's retailers were not intended to be the ultimate consumers of Systems and have no rights under the warranty agreements. Generac's warranties were designed for and intended to benefit the consumer only and Plaintiffs and putative Class Members were the intended beneficiaries.

251. More specifically, Generac's intention that its warranties apply to Plaintiffs and putative Class Members as third-party beneficiaries is evident from the statements contained in its product literature, including the Limited Warranty. Likewise, it was reasonably foreseeable that

58

Plaintiffs and putative Class Members would be the intended beneficiaries of the Systems (as they are Systems intended, marketed, and sold for residential—and not retail—use) and warranties.

252.    Generac impliedly warranted that the Systems were of merchantable quality and fit for such use.  These implied warranties included, among other things: (i) a warranty that the Systems manufactured, supplied, distributed, and/or sold by Generac were safe to use; and (ii) a warranty that the Systems would be fit for their intended use while they were being used by consumers.

253.    Contrary to the applicable implied warranties, the Systems, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiffs and putative Class Members with safe and reliable electricity management.  Instead, the Systems suffered, and continue to suffer, from a design and/or manufacturing defect, as alleged herein.

254.    Generac's failure to adequately repair or replace the defective Systems caused the warranty to fail in its essential purpose.

255.    Generac breached the implied warranties because the Systems were sold with a design and/or manufacturing Defect, which substantially reduced or ceased the expected performance of the Systems and made them unsafe during ordinary, intended, residential use.

256.    As a direct and proximate result of the foregoing, Plaintiffs and putative Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

257.    Generac had notice of these claims at least as of November 21, 2022, when Plaintiffs sent written notice to Defendant via certified mail through the United States Postal Service demanding corrective actions for the unfair or deceptive acts described *supra*.  Each Plaintiff provided notice of their claims as of the date of this filing by way of this Class Action

Complaint. Defendant also had notice of Plaintiffs' claims due to monitoring of Plaintiffs and putative Class Members' Systems via their applications and connection to the Internet. Furthermore, Plaintiffs need only provide notice to the seller, not the manufacturer, which upon information and belief each Plaintiff has previously done and is otherwise unable to do now as a result of PHS being defunct. Notwithstanding Plaintiffs' provisions of notice, any such notice is futile as there is no non-defective replacement component to cure the Defect alleged herein.

258. Generac had notice and denied warranty claims for Plaintiffs Kibert Basler, Herrington, Quednau, and Fawcett. Plaintiff Kibert Basler was unable to schedule service on her System because each authorized dealer provided to her through Generac declined to service her System. Plaintiff Herrington scheduled warranty service through PHS which remains incomplete and unable to be completed. Plaintiff Quednau sought service on her System but has not been able to locate an authorized dealer who would provide service. Plaintiff Fawcett received an inspection of her System, but the technician would not look at her Snaps.

## COUNT II
**Breach of Express Warranty**
**(On Behalf of the Named Plaintiffs and the Nationwide Class and,**
**In the Alternative, Each State Subclass)**

259. Plaintiffs hereby adopt and incorporate by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

260. Plaintiffs and putative Class Members purchased the Systems from Defendant through its authorized retailers.

261. Generac is and was at all relevant times a "merchant" under U.C.C. § 2-313, and related state-specific U.C.C. provisions.

60

262.     In connection with its sale of the Systems, Generac, as the designer, manufacturer, marketer, distributor or seller, expressly warranted that the Systems were safe and reliable at managing electricity.

263.     Generac's warranty representations consist of its pervasive marketing campaign, including the representations described herein that are made online and on its packaging.

264.     The express written warranties covering the Systems were a material part of the bargain between Generac and consumers.  At the time it made these express warranties, Generac knew reasonable consumers, including Plaintiffs and putative Class Members, were purchasing the Systems because they believed the System to be as represented and marketed.

265.     Each of the Systems has an identical or substantially identical product representation(s) as Generac represents that all its Systems safely and reliably manage electricity.

266.     Generac breached its express warranties by selling Systems that were, in actuality, not safe and reliable at managing electricity as promised in the labeling and marketing.  Generac breached the warranty because it sold the Systems with a design and/or manufacturing Defect, which was known to Generac and unknown to consumers at the time of sale.  Generac further breached the warranty because it improperly and unlawfully denies valid warranty claims, and it has failed or refused to adequately repair or replace the Systems with units that are actually as represented.

267.     Generac breached its express warranty to adequately repair or replace the Systems despite its knowledge of the Defect, and/or despite its knowledge of alternative formulations, designs, materials, and/or options for manufacturing the Systems.

268.     Generac further breached its express written warranties to Plaintiffs and putative Class Members in that the Systems contain the Defect at the time they leave the manufacturing

plant, and on the first day of purchase, and by failing to disclose and actively concealing this risk from consumers.

269.    The Systems that Plaintiffs and putative Class Members purchased contained a Defect which makes them unable to safely and reliably manage electricity and causes loss of the System, loss of use of the System, and loss of the benefit of their bargain.  Generac's warranty expressly applies to the original purchaser and any succeeding owner of the Systems at the original site of the System for Systems purchased within the United States, creating privity between Generac on the one hand, and Plaintiffs and putative Class Members on the other.

270.    Likewise, it was reasonably foreseeable that Plaintiffs and putative Class Members would be the intended beneficiaries of the Systems and warranties, creating privity or an exception to any privity requirement.  Plaintiffs and putative Class Members are the intended beneficiaries of Generac's warranties and its sale through retailers. The retailers were not intended to be the ultimate consumers of the Systems and have no rights under the warranty agreements provided by Generac.  Generac warranties were designed for and intended to benefit the consumer only and Plaintiffs and putative Class Members were the intended beneficiaries of the Systems as the Systems are intended, marketed, and sold for residential—and not retail—use.

271.    Generac has been provided sufficient notice of its breaches of the express warranties associated with the Systems.

272.    Upon information and belief, Generac received further notice and has been on notice of its breach of warranties through its sale of the Systems and of its breaches of warranties through customer warranty claims reporting problems with the Systems, consumer complaints at various sources, and its own internal and external testing.

62

273. As a direct and proximate result of Generac's breach of its express written warranties, Plaintiffs and putative Class Members suffered damages and did not receive the benefit of the bargain and are entitled to recover compensatory damages, including, but not limited to, the cost of inspection, repair, and diminution in value. Plaintiffs and putative Class Members suffered damages at the point-of-sale stemming from their overpayment for the Systems, in addition to loss of the Systems and its intended benefits.

274. Generac had notice of these claims at least as of November 21, 2022, when Plaintiffs sent written notice to Defendant via certified mail through the United States Postal Service demanding corrective actions for the unfair or deceptive acts described *supra*. Each Plaintiff also provided notice of their claims as of the date of this filing by way of this Class Action Complaint. Defendants had further notice of Plaintiffs' claims due to its monitoring of Plaintiffs and putative Class Members' Systems via their applications and connection to the Internet. Furthermore, Plaintiffs need only provide notice to the seller, not the manufacturer, which upon information and belief each Plaintiff previously has done and is otherwise unable to do now as a result of PHS being defunct. Notwithstanding Plaintiffs' provisions of notice, any such notice is futile as there is no non-defective replacement component to cure the Defect alleged herein.

275. Generac had notice and denied warranty claims for Plaintiffs Kibert Basler, Herrington, Quednau, and Fawcett. Plaintiff Kibert Basler was unable to schedule service on her System because each authorized dealer provided to her through Generac declined to service her System. Plaintiff Herrington scheduled warranty service through PHS which remains incomplete and unable to be completed. Plaintiff Quednau sought service on her System but has not been able to locate an authorized dealer who would provide service. Plaintiff Fawcett received an inspection of her System, but the technician would not look at her Snaps.

## COUNT III
## (IN THE ALTERNATIVE)
### Breach of Contract/Breach of Common Law Warranty
### (On behalf of the Named Plaintiffs and the Nationwide Class and,
### In the Alternative, Each State Subclass)

276. Plaintiffs hereby adopt and incorporate by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

277. To the extent Generac's commitment is deemed not to be a warranty under the Uniform Commercial Code or common law, Plaintiffs plead in the alternative under common law warranty and contract law.

278. Plaintiffs and putative Class Members purchased the Systems from Generac through authorized retailers.

279. Generac expressly warranted that the Systems were fit for their intended purpose of safely and reliably managing electricity and that they were free from defects.

280. Generac made the foregoing express representations and warranties to all consumers, which became the basis of the bargain between Plaintiffs and putative Class Members, and Generac.

281. Generac breached the warranties and/or contract obligations by placing the defective Systems into the stream of commerce and selling them to consumers, when it knew the Systems contained the Defect, were prone to premature failure, and did not safely and reliably manage electricity. These deficiencies substantially and/or completely impair the use and value of the Systems.

282. The deficiencies described existed when the Systems left Generac's possession or control and were sold to Plaintiffs and putative Class Members. The deficiencies and impairment

of the use and value of the Systems were not discoverable by Plaintiffs and putative Class Members at the time of purchase of the Systems.

283. As a direct and proximate cause of Generac's breach of contract, Plaintiffs and putative Class Members were harmed because they would not have purchased the Systems if they knew the truth about the defective condition of the Systems.

**COUNT IV**
**(IN THE ALERNATIVE)**
**Negligent Misrepresentation**
**(On behalf of the Named Plaintiffs and the Nationwide Class and,**
**In the Alternative, Each State Subclass)**

284. Plaintiffs hereby adopt and incorporate by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

285. Plaintiffs must prove the following for a negligent misrepresentation claim: (1) a false statement of a material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement.

286. As a seller of the Systems and a merchant, Generac had a duty to give correct information to Plaintiffs and putative Class Members regarding the truth about whether the Systems contain a defect. Generac had sole possession and control of this information and had a duty to disclose it accurately to Plaintiffs and putative Class Members.

287. Generac represented that the Systems were safely and reliably able to manage electricity, when in reality, the Defect renders the System unable to do so. Generac knew, or should have known, that the Systems contained the Defect.

288. The information supplied by Generac—that the Systems are safely and reliably able to manage electricity—was known by Generac to be desired by Plaintiffs and putative Class

65

Members to induce them to purchase the Systems. Generac knew that making these representations would induce customers to purchase its Systems over energy systems offered by competitors.

289.     Plaintiffs and putative Class Members relied upon Generac's representations that the Systems were safely and reliably able to manage electricity when purchasing the Systems. Further, this reliance was, in fact, to their detriment because Plaintiffs and putative Class Members purchased the Systems containing the Defect.

290.     Plaintiffs and putative Class Members are entitled to all relief the Court deems proper as a result of Generac's actions described herein.

## COUNT V
### Fraud
### (On behalf of the Named Plaintiffs and the Nationwide Class and, In the Alternative, Each State Subclass)

291.     Plaintiffs hereby adopt and incorporate by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

292.     Generac knew or should have known that the Systems contained the Defect.

293.     Generac provided Plaintiffs and putative Class Members with false or misleading material information and failed to disclose material facts about the true nature of the Systems, including the fact that they contained the Defect which rendered them incapable of safely and reliably managing electricity.

294.     Generac had exclusive knowledge of the Defect at the time of sale and at all other relevant times.  Neither Plaintiffs nor putative Class Members, in the exercise of reasonable diligence, could have independently discovered the Defect prior to purchase.

295.     Generac had the capacity to, and did, deceive Plaintiffs and putative Class Members, into believing they were purchasing Systems free from defects.

296.     Generac undertook active and ongoing steps to conceal the presence of the Defect in the Systems.  Plaintiffs are not aware of anything in Generac's advertising, publicity, or marketing materials that disclosed the truth about the Systems, despite Generac's awareness of the Defect.

297.     The facts concealed and/or not disclosed by Generac to Plaintiffs and putative Class Members are material facts in that a reasonable person would have considered them important in deciding whether to purchase (or pay the same price for) the Systems.

298.     Generac intentionally concealed and/or failed to disclose material facts for the purpose of inducing Plaintiffs and putative Class Members to act thereon.

299.     Plaintiffs and putative Class Members justifiably acted or relied upon the concealed and/or nondisclosed facts to their detriment, as evidenced by their purchase of the Systems.

300.     Plaintiffs and putative Class Members suffered a loss of money in an amount to be proven at trial as a result of Generac's fraudulent concealment and nondisclosure because they would not have purchased the Systems or would not have purchased the Systems for the price they did, if the true facts concerning the Systems had been known.

301.     Plaintiffs and putative Class Members are entitled to all relief the Court deems proper as a result of Generac's actions described herein.

**COUNT VI**
**(IN THE ALTERNATIVE)**
**Unjust Enrichment**
**(On Behalf of the Named Plaintiffs and the Nationwide Class or,**
**in the Alternative, Each State Subclass)**

302.     Plaintiffs hereby adopt and incorporate by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

303.     This alternative claim is asserted on behalf of Plaintiffs and putative Class Members to the extent there is any determination that any contracts between putative Class Members and Generac do not govern the subject matter of the disputes with Generac, or that Plaintiffs do not have standing to assert any contractual claims against Generac.

304.     Plaintiffs and putative Class Members conferred a monetary benefit on Generac, and Generac had knowledge of this benefit.  The cost of the System is at least $50,000.00.

305.     By its wrongful acts and omissions described herein, including selling the defective System, Generac was unjustly enriched at the expense of Plaintiffs and putative Class Members.

306.     Plaintiffs and putative Class Members' detriment and Generac's enrichment were related to and flowed from the wrongful conduct alleged in this Class Action Complaint.

307.     It would be inequitable for Generac to retain the profits, benefits, and other compensation obtained from its wrongful conduct as described herein in connection with selling the defective Systems.

308.     Plaintiffs and putative Class Members seek restitution from Generac and an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by Generac from their wrongful conduct and establishing a constructive trust from which Plaintiffs and putative Class Members may seek restitution.

## COUNT VII
### Violation of Georgia's Uniform Deceptive Trade Practices Act
### O.C.G.A. § 10-1-370, *et seq*.
### (On Behalf of Plaintiff Kibert Basler and the Georgia Subclass)

309.     Plaintiff Kibert Basler hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

68

310.     Generac, Plaintiff Kibert Basler, and putative Georgia Subclass Members are "persons" within the meaning of Georgia's Uniform Deceptive Trade Practices Act ("Georgia UDTPA"). O.C.G.A. § 10-1-371(5).

311.     The Georgia UDTPA prohibits "deceptive trade practices" which include the "misrepresentation of standard, quality, or grade of goods and services," "engaging in any other conduct which similar creates a likelihood of confusing or misunderstanding," and representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have," and "[a]dvertising goods or services with intent not to sell them as advertised." O.C.G.A. § 10-1-372.

312.     By misrepresenting that the Systems safely and reliably manage electricity and otherwise failing to disclose the nature of the Defect in the Systems to Plaintiff Kibert Basler and putative Georgia Subclass Members, Generac engaged in deceptive trade practices in violation of the Georgia UDTPA, because Generac represented that the Systems had characteristics and benefits that they do not have, and represented that the Systems were of a particular standard, quality, or grade when they were of another. *See* O.C.G.A. §§ 10-1-372(5), (7), (9).

313.     Generac advertised the Systems as capable of safe and reliable electricity management with the intent not to sell it as advertised given its knowledge it was not so, in violation of O.C.G.A. §10-1-372.

314.     Generac's unfair and deceptive acts or practices occurred repeatedly in Generac's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm to owners and purchasers of the Systems.

69

315. Generac knew, by June 2021 at the latest, that the Systems suffered from the Defect, were not safely and reliably able to manage electricity, and were not suitable for their intended use.

316. Generac had exclusive knowledge of material facts concerning the Defect in the Systems and that the Systems were not able to safely and reliably manage electricity. However, Generac actively concealed the Defect from consumers by denying the existence of the Defect to consumers complaining about the Defect and continuing to represent the Systems as suitable for their intended use.

317. Generac was under a duty to Plaintiff Kibert Basler and putative Georgia Subclass Members to disclose the defective nature of the Systems because, *inter alia*:

    a. Generac was in a superior position to know the true state of facts about the Defect and were not able to safely and reliably manage electricity; and

    b. Plaintiff Kibert Basler and putative Georgia Subclass Members could not reasonably have been expected to learn or discover that the Systems had the Defect and were not able to safely and reliably manage electricity at the time of purchase (and before damage occurred to the Systems).

318. Despite possessing information to the contrary, Generac misrepresented the Systems as able to safely and reliably manage electricity and otherwise failed to disclose and actively concealed the Defect while continuing to market and sell the Systems.

319. Generac knew or should have known that its conduct violated the Georgia UDTPA.

320. In misrepresenting the Systems as able to safely and reliably manage electricity, failing to disclose the Defect, and denying and misleading consumers as to the Defect and quality of the Systems, Generac knowingly and intentionally concealed material facts and breached its duty not to do so.

70

321.     The facts Generac misrepresented to and concealed from Plaintiff Kibert Basler and putative Georgia Subclass Members were material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase the Systems.  Moreover, a reasonable consumer would consider the Defect and lack of capability to safely and reliably manage electricity to be an undesirable quality, as Plaintiff Kibert Basler and putative Georgia Subclass Members did.  Had Plaintiff Kibert Basler and putative Georgia Subclass Members known that the Systems contained the Defect, they would not have purchased the Systems, or would have paid less for them.

322.     As a result of Generac's misconduct, Plaintiff Kibert Basler and putative Subclass Members have been harmed and suffered actual damages in that the Systems have a serious safety Defect which risks personal injury and damage to property.

323.     As a direct and proximate result of Generac's unfair or deceptive acts or practices, Plaintiff Kibert Basler and putative Georgia Subclass Members have suffered and will continue to suffer actual damages.

324.     Generac's violation presents a continuing risk to Plaintiff Kibert Basler, putative Georgia Subclass Members, and the general public, as it continues to make representations that the Systems are able to safely and reliably manage electricity and continues to replace defective Snap components with more defective components under the Limited Warranty.  Generac's unlawful acts and practices complained of herein affect the public interest.

325.     Generac had received timely notice of violations of O.C.G.A. § 10-1-390, *et seq*. far in advance of this litigation via countless consumer complaints.  Without admitting the System contains the Defect, Generac acknowledged the need for new Snap models to be installed as of June 2022.

326. Notwithstanding adequate and ample notice from Georgia consumers, without admitting the System contains the Defect, Generac acknowledged the need for new Snap models to be installed as of June 2022.

327. As a direct and proximate result of Generac's violations of the Georgia UDTPA, Plaintiff Kibert Basler and putative Georgia Subclass Members have suffered injury-in-fact and/or actual damage. Had they been aware of the Defect in the Systems, Plaintiff Kibert Basler and putative Georgia Subclass Members either would have paid less for their Systems or would not have purchased them at all, or would have negotiated different terms of the warranty. Plaintiff Kibert Basler and putative Georgia Subclass Members did not receive the benefit of their bargain as a result of Generac's misconduct.

328. Plaintiff Kibert Basler and putative Georgia Subclass Members seek an order enjoining Generac's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA and applicable law.

## COUNT VIII
### Violation of Illinois' Consumer Fraud Act
### 815 ILCS §§ 505, *et seq*.
### (On Behalf of Plaintiff Amend and the Illinois Subclass)

329. Plaintiff Amend hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

330. Generac is a "person" as defined by 815 Ill. Comp. Stat. §§ 505/1(c).

331. Plaintiff Amend and putative Illinois Subclass Members are "consumers" as defined by 815 Ill. Comp. Stat. §§ 505/1(e).

332. Generac's conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 Ill. Comp. Stat. § 505/1(f).

333.     Generac's deceptive, unfair, and unlawful trade acts or practices, in violation of

815 Ill. Comp. Stat. § 505/2, include:

    a.  Having extensive knowledge of the defective nature of the Systems and failing to disclose to Plaintiff Amend and putative Illinois Subclass Members;

    b.  Representing the Systems as capable of safe and reliable management of electricity when they were not due to the Defect;

    c.  Conveying a warranty with the sale of its Systems when it does not intend to honor the warranty by replacing the defective Systems with non-defective Systems;

    d.  In failing to disclose to Plaintiff Amend and putative Illinois Subclass Members that the Systems:

        i.  were defective;

        ii.  were not able to safely manage electricity;

        iii.  were not able to reliably manage electricity;

        iv.  would prematurely fail;

        v.  cannot be expected to fulfill their expected service life; and

        vi.  would pose a safety hazard to individuals and their property once the Defect manifests.

334.     Generac's representations and omissions were material because they were likely to

lead reasonable consumers to believe that they were purchasing and using Systems which were

free of defects; were safely and reliably capable of managing electricity; of high quality; would

not prematurely fail; were not a safety hazard; and came with a warranty that Generac would honor.

335.     Generac intended to mislead Plaintiff Amend and putative Illinois Subclass

Members and induce them to rely on its misrepresentations and omissions.

336.     The above unfair and deceptive practices and acts by Generac offend public policy,

and were immoral, unethical, oppressive, and unscrupulous.  These acts caused substantial injury

73

that these consumers could not reasonably avoid and this substantial injury outweighed any benefits to consumers or to competition.

337.     Generac acted intentionally, knowingly, and maliciously to violate Illinois's Consumer Fraud Act, and recklessly disregarded Plaintiff Amend and putative Illinois Subclass Members' rights.

338.     As a direct and proximate result of Generac's unfair, unlawful, and deceptive acts and practices, Plaintiff Amend and putative Illinois Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including the perpetration of further deception by Generac.  Had they been aware of the Defect in the Systems, Plaintiff Amend and putative Illinois Subclass Members either would have paid less for their Systems or would not have purchased them at all, or would have negotiated different terms of the warranty.  Plaintiff Amend and putative Illinois Subclass Members did not receive the benefit of their bargain as a result of Generac's misconduct.

339.     Plaintiff Amend and putative Illinois Subclass Members seek all monetary and non-monetary relief allowed by law, including damages, restitution, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT IX
### Violation of Illinois' Uniform Deceptive Trade Practices Act
### 815 ILCS §§ 510/2, *et seq.*
### (On Behalf of Plaintiff Amend and the Illinois Subclass)

340.     Plaintiff Amend hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

341.     Generac is a "person" as defined by 815 Ill. Comp. Stat. §§ 510/1(5).

342.     Generac engaged in deceptive trade practices in the conduct of its business, in violation of 815 Ill. Comp. Stat. §§ 510/2(a), including:

a.  Representing that goods or services have characteristics that they do not have;

b.  Representing that goods or services are of a particular standard, quality, or grade if they are of another;

c.  Advertising goods or services with intent not to sell them as advertised; and

d.  Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

343.  Generac's deceptive trade practices include:

a.  Having extensive knowledge of the defective nature of the Systems and failing to disclose to Plaintiff Amend and putative Illinois Subclass Members;

b.  Representing the Systems as capable of safe and reliable management of electricity when they were not due to the Defect;

c.  Conveying a warranty with the sale of its Systems when it does not intend to honor the warranty by replacing the defective Systems with non-defective Systems;

d.  In failing to disclose to Plaintiff Amend and putative Illinois Subclass Members that the Systems:

i.  were defective;

ii.  were not able to safely manage electricity;

iii.  were not able to reliably manage electricity;

iv.  would prematurely fail;

v.  cannot be expected to fulfill their expected service life; and

vi.  would pose a safety hazard to individuals and their property once the Defect manifests.

344.  Generac's representations and omissions were material because they were likely to lead reasonable consumers to believe that they were purchasing and using Systems which were free of defects; were safely and reliably capable of managing electricity; of high quality; would not prematurely fail; were not a safety hazard; and came with a warranty that Generac would honor.

345. The above unfair and deceptive practices and acts by Generac were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff Amend and putative Illinois Subclass Members that they could not reasonably avoid and this substantial injury outweighed any benefits to consumers or to competition.

346. As a direct and proximate result of Generac's unfair, unlawful, and deceptive acts and practices, Plaintiff Amend and putative Illinois Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including that the perpetration of further deception by Generac. Had they been aware of the Defect in the Systems, Plaintiff Amend and putative Illinois Subclass Members either would have paid less for their Systems or would not have purchased them at all, or would have negotiated different terms of the warranty. Plaintiff Amend and putative Illinois Subclass Members did not receive the benefit of their bargain as a result of Generac's misconduct.

347. Plaintiff Amend and putative Illinois Subclass Members seek all monetary and non-monetary relief allowed by law, including damages, restitution, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**COUNT X**
**Violation of Indiana's Deceptive Consumer Sales Act**
**Ind. Code §§ 24-5-0.5-1, *et seq*.**
**(On Behalf of Plaintiff Wheat and the Indiana Subclass)**

348. Plaintiffs Wheat hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

349. Generac is a "person" as defined by Ind. Code § 24-5-0.5-2(a)(2).

350. Generac is a "supplier" as defined by Ind. Code § 24-5-0.5-2(a)(1), because it regularly engages in or solicits "consumer transactions," within the meaning of Ind. Code § 24-5-0.5-2(a)(3)(A).

76

351. Generac engaged in unfair, abusive, and deceptive acts, omissions, and practices in connection with consumer transactions, in violation of Ind. Code § 24-5-0.5-3(a).

352. Generac's representations and omissions include both implicit and explicit representations.

353. Generac's unfair, abusive, and deceptive acts, omissions, and practices include:

a. Having extensive knowledge of the defective nature of the Systems and failing to disclose to Plaintiff Wheat and putative Indiana Subclass Members;

b. Representing the Systems as capable of safe and reliable management of electricity when they were not due to the Defect;

c. Conveying a warranty with the sale of its Systems when it does not intend to honor the warranty by replacing the defective Systems with non-defective Systems;

d. In failing to disclose to Plaintiff Wheat and putative Indiana Subclass Members that the Systems:

   i. were defective;

   ii. were not able to safely manage electricity;

   iii. were not able to reliably manage electricity;

   iv. would prematurely fail;

   v. cannot be expected to fulfill their expected service life; and

   vi. would pose a safety hazard to individuals and their property once the Defect manifests.

e. Failing to comply with common law and statutory duties pertaining to the manufacture of Generac's Systems, including the Indiana Deceptive Consumer Sales Act as well as other states' consumer protection statutes, which was a direct and proximate cause of the injury suffered due to the Defect;

f. Misrepresenting that it would comply with common law and statutory duties pertaining to the manufacture of Generac's Systems, including duties imposed by the Indiana Deceptive Consumer Sales Act as well as other states' consumer protection statutes;

77

g.  Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the manufacture of Generac's Systems, including duties imposed by the Indiana Deceptive Consumer Sales Act as well as other states' consumer protection statutes; and

h.  Failing to timely and adequately notify Plaintiff Wheat and putative Indiana Subclass Members of the Defect.

354.    Generac's acts and practices were "unfair" because they caused or were likely to cause substantial injury to consumers which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

355.    Generac's representations and omissions were material because they were likely to lead reasonable consumers to believe that they were purchasing and using Systems which were free of defects; were safely and reliably capable of managing electricity; of high quality; would not prematurely fail; were not a safety hazard; and came with a warranty that Generac would honor.

356.    The injury to consumers from Generac's conduct was and is substantial because it was non-trivial and non-speculative; and involved a large monetary injury and a safety risk to consumers. The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of harm on each consumer.

357.    Consumers could not have reasonably avoided injury because Generac's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers about the Defect, Generac created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

358.    The Defect had no countervailing benefit to consumers or to competition.

359.    Generac's acts and practices were "abusive" for numerous reasons, including:

a. Because they materially interfered with consumers' ability to understand a term or condition in a consumer transaction. Generac's failure to disclose the Defect interfered with consumers' decision-making in a variety of their transactions.

b. Because they took unreasonable advantage of consumers' lack of understanding about the material risks, costs, or conditions of a consumer transaction. Without knowing about the Defect, consumers lacked an understanding of the material risks and costs of a variety of their transactions.

c. Because they took unreasonable advantage of consumers' inability to protect their own interests. Consumers could not protect their interests due to the asymmetry in information between them and Generac concerning the Defect.

d. Because Generac took unreasonable advantage of consumers' reasonable reliance that it was acting in their interests to manufacture a product free from Defect and as represented. Consumers' reliance was reasonable for the reasons discussed below.

360. Generac also engaged in "deceptive" acts and practices in violation of Indiana Code § 24-5-0.5-3(a) and § 24-5-0.5-3(b), including:

a. Misrepresenting that the subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have;

b. Misrepresenting that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not;

c. Misrepresenting that the subject of a consumer transaction will be supplied to the public in greater quantity (i.e., more data security) than the supplier intends or reasonably expects; and

d. Omitting from its representations and warranties that the System contains the Defect to which Generac has no remedy.

361. Generac intended to mislead Plaintiff Wheat and putative Indiana Subclass Members and induce them to rely on its misrepresentations and omissions.

362. Generac's representations and omissions were material because they were likely to deceive reasonable consumers about the System and the presence of the Defect.

79

363. Generac's representations and omissions were material because they were likely to deceive reasonable consumers, including Plaintiff Wheat and putative Indiana Subclass Members, that their Systems would be defect-free at the time of purchase.

364. Had Generac disclosed the Defect to Plaintiff Wheat and putative Indiana Subclass Members, Generac would have been unable to continue in business and it would have been forced to create a defect-free System and comply with the law. Instead, Generac manufactured the System and profited significantly as a result. Accordingly, because Generac held itself out as manufacturing a defect-free System, Plaintiff Wheat and putative Indiana Subclass Members acted reasonably in relying on Generac's misrepresentations and omissions, the truth of which they could not have discovered.

365. Generac had a duty to disclose the above-described facts due to the circumstances of this case. This duty arose because Generac represented the System as having certain qualities to the general public, including Plaintiff Wheat and putative Indiana Subclass Members, warranted those representations, and profited because of those representations, warranties, and omissions to the contrary. Accordingly, because Generac represented and warranted the System as such, Plaintiff Wheat and putative Indiana Subclass Members acted reasonably in relying on Generac's misrepresentations and omissions, the truth of which they could not have discovered. In addition, such a duty is implied by law due to the nature of the relationship between consumers—including Plaintiff Wheat and putative Indiana Subclass Members—and Generac, because consumers are unable to know at the time of purchase whether the System contains the Defect, and therefore was required to place trust and confidence in Generac. Generac's duty to disclose also arose from its:

    a. Possession of exclusive knowledge regarding the Defect;

    b. Active concealment of the Defect; and/or

c. Incomplete representations about the quality of the Systems, while purposefully withholding material facts from Plaintiff Wheat and putative Indiana Subclass Members that contradicted these representations.

366. Generac acted intentionally, knowingly, and maliciously to violate Indiana's Deceptive Consumer Sales Act, and recklessly disregarded Plaintiff Wheat and putative Indiana Subclass Members' rights. Generac's actions were not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.

367. Generac had notice of these claims at least as of November 21, 2022, when Plaintiff Wheat sent written notice to Defendant via certified mail through the United States Postal Service demanding corrective actions for the unfair or deceptive acts described *supra*. Plaintiff Wheat also provided notice of her claims as of the date of this filing by way of this Class Action Complaint. Defendant had further notice of Plaintiff Wheat's claims due to its monitoring of Plaintiff Wheat's and putative Indiana Class Members' Systems via their applications and connection to the Internet. Notwithstanding Plaintiff Wheat's provision of notice, any such notice is futile as there is no non-defective replacement component to cure the Defect alleged herein.

368. Generac's conduct includes incurable deceptive acts that Generac engaged in as part of a scheme, artifice, or device with intent to defraud or mislead, under Ind. Code § 24-5-0.5-2(a)(8).

369. As a direct and proximate result of Generac' uncured or incurable unfair, abusive, and deceptive acts or practices, Plaintiff Wheat and putative Indiana Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages. Had they been aware of the Defect in the Systems, Plaintiff Wheat and putative Indiana Subclass Members either would have paid less for their Systems or would not have purchased them at all, or would have negotiated different terms of the warranty. Plaintiff

Wheat and putative Indiana Subclass Members did not receive the benefit of their bargain as a result of Generac's misconduct.

370.    Generac's violations present a continuing risk to Plaintiff Wheat and putative Indiana Subclass Members as well as to the general public.

371.    Plaintiff Wheat and putative Indiana Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, punitive damages, attorneys' fees and costs, injunctive relief, and any other appropriate relief.

**COUNT XI**
**Violation of Kansas' Consumer Protection Act**
**K.S.A. §§ 50-623, *et seq*.**
**(On Behalf of Plaintiff Donley and the Kansas Subclass)**

372.    Plaintiffs Donley hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

373.    K.S.A. §§ 50-623, *et seq*. is to be liberally construed to protect consumers from suppliers who commit deceptive and unconscionable practices.

374.    Plaintiff Donley and putative Kansas Subclass Members are "consumers" as defined by K.S.A. § 50-624(b).

375.    The acts and practices described herein are "consumer transactions," as defined by K.S.A. § 50-624(c).

376.    Generac is a "supplier" as defined by K.S.A. § 50-624(l).

377.    Generac advertised, offered, or sold goods or services in Kansas and engaged in trade or commerce directly or indirectly affecting the people of Kansas.

378.    Generac engaged in deceptive and unfair acts or practices, including:

  a.  Having extensive knowledge of the defective nature of the Systems and failing to disclose to Plaintiff Donley and putative Kansas Subclass Members;

82

b.  Representing the Systems as capable of safe and reliable management of electricity when they were not due to the Defect;

c.  Conveying a warranty with the sale of its Systems when it does not intend to honor the warranty by replacing the defective Systems with non-defective Systems;

d.  In failing to disclose to Plaintiff Donley and putative Kansas Subclass Members that the Systems:

   i.  were defective;

   ii.  were not able to safely manage electricity;

   iii.  were not able to reliably manage electricity;

   iv.  would prematurely fail;

   v.  cannot be expected to fulfill their expected service life; and

   vi.  would pose a safety hazard to individuals and their property once the Defect manifests.

e.  Failing to comply with common law and statutory duties pertaining to the manufacture of Generac's Systems, including the Kansas Consumer Protection Act as well as other states' consumer protection statutes, which was a direct and proximate cause of the injury suffered due to the Defect;

f.  Misrepresenting that it would comply with common law and statutory duties pertaining to the manufacture of Generac's Systems, including duties imposed by the Kansas Consumer Protection Act as well as other states' consumer protection statutes;

g.  Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the manufacture of Generac's Systems, including duties imposed by the Kansas Consumer Protection Act as well as other states' consumer protection statutes; and

h.  Failing to timely and adequately notify Plaintiff Donley and putative Kansas Subclass Members of the Defect.

379.  Generac's representations and omissions were material because they were likely to lead reasonable consumers to believe that they were purchasing and using Systems which were free of defects; were safely and reliably capable of managing electricity; of high quality; would not prematurely fail; were not a safety hazard; and came with a warranty that Generac would honor.

83

380.     Generac intended to mislead Plaintiff Donley and putative Kansas Subclass Members and induce them to rely on its misrepresentations and omissions.

381.     Had Generac disclosed the Defect to Plaintiff Donley and putative Kansas Subclass Members, Generac would have been unable to continue in business and it would have been forced to create a defect-free System and comply with the law.  Instead, Generac manufactured the System and profited significantly as a result.  Accordingly, because Generac held itself out as manufacturing a defect-free System, Plaintiff Donley and putative Kansas Subclass Members acted reasonably in relying on Generac's misrepresentations and omissions, the truth of which they could not have discovered.

382.     Generac also engaged in unconscionable acts and practices in connection with a consumer transaction, in violation of K.S.A. § 50-627, including:

    a.    Knowingly taking advantage of the inability of Plaintiff Donley and putative Kansas Subclass Members to reasonably protect their interests, due to their lack of knowledge (see K.S.A. § 50-627(b)(1)); and

    b.    Requiring Plaintiff Donley and putative Kansas Subclass Members to enter into a consumer transaction on terms that Generac knew were substantially one-sided in favor of Generac (see K.S.A. § 50-627(b)(5)).

383.     Plaintiff Donley and putative Kansas Subclass Members had unequal bargaining power with respect to their warranties.

384.     The above unfair, deceptive, and unconscionable practices and acts by Generac were immoral, unethical, oppressive, and unscrupulous.  These acts caused substantial injury to Plaintiff Donley and putative Kansas Subclass Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

84

385. Generac acted intentionally, knowingly, and maliciously to violate Kansas's Consumer Protection Act, and recklessly disregarded Plaintiff Donley and putative Kansas Subclass Members' rights.

386. As a direct and proximate result of Generac's unfair, deceptive, and unconscionable trade practices, Plaintiff Donley and putative Kansas Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages. Had they been aware of the Defect in the Systems, Plaintiff Donley and putative Kansas Subclass Members either would have paid less for their Systems or would not have purchased them at all, or would have negotiated different terms of the warranty. Plaintiff Donley and putative Kansas Subclass Members did not receive the benefit of their bargain as a result of Generac's misconduct.

387. Plaintiff Donley and putative Kansas Subclass Members seek all monetary and non-monetary relief allowed by law, including civil penalties or actual damages (whichever is greater), under K.S.A. §§ 50-634 and 50-636; injunctive relief; and reasonable attorneys' fees and costs.

## COUNT XII
**Violation of Michigan's Consumer Protection Act**
**Mich. Comp. Laws. Ann. §§ 445.903, *et seq*.**
**(On Behalf of Plaintiffs Herrington, Leon, Quednau, and the Michigan Subclass)**

388. Plaintiffs Herrington, Leon, and Quednau hereby adopt and incorporate by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

389. Plaintiffs Herrington, Leon, Quednau, putative Michigan Subclass Members, and Generac are "persons" as defined by Mich. Comp. Laws Ann. § 445.903(d).

390. Generac advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws Ann. § 445.903(g).

391. Generac engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Mich. Comp. Laws Ann. § 445.903(1), including:

   a. Representing that its goods and services have characteristics, uses, and benefits that they do not have, in violation of Mich. Comp. Laws Ann. § 445.903(1)(c);

   b. Representing that its goods and services are of a particular standard or quality if they are of another in violation of Mich. Comp. Laws Ann. § 445.903(1)(e);

   c. Making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, in violation of Mich. Comp. Laws Ann. § 445.903(1)(bb); and

   d. Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive matter, in violation of Mich. Comp. Laws Ann. § 445.903(1)(cc).

392. Generac's unfair, unconscionable, and deceptive practices include:

   a. Having extensive knowledge of the defective nature of the Systems and failing to disclose to Plaintiffs Herrington, Leon, Quednau, and putative Michigan Subclass Members;

   b. Representing the Systems as capable of safe and reliable management of electricity when they were not due to the Defect;

   c. Conveying a warranty with the sale of its Systems when it does not intend to honor the warranty by replacing the defective Systems with non-defective Systems;

   d. In failing to disclose to Plaintiffs Herrington, Leon, Quednau, and putative Michigan Subclass Members that the Systems:

      i. were defective;

      ii. were not able to safely manage electricity;

      iii. were not able to reliably manage electricity;

      iv. would prematurely fail;

      v. cannot be expected to fulfill their expected service life; and

      vi. would pose a safety hazard to individuals and their property once the Defect manifests.

86

393.     Generac's representations and omissions were material because they were likely to lead reasonable consumers to believe that they were purchasing and using Systems which were free of defects; were safely and reliably capable of managing electricity; of high quality; would not prematurely fail; were not a safety hazard; and came with a warranty that Generac would honor.

394.     Generac intended to mislead Plaintiffs Herrington, Leon, Quednau, and putative Michigan Subclass Members and induce them to rely on its misrepresentations and omissions.

395.     Generac acted intentionally, knowingly, and maliciously to violate Michigan's Consumer Protection Act, and recklessly disregarded Plaintiffs Herrington, Leon, Quednau, putative Michigan Subclass Members' rights.

90.     As a direct and proximate result of Generac's unfair, unconscionable, and deceptive practices, Plaintiffs Herrington, Leon, Quednau, and putative Michigan Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.   Had they been aware of the Defect in the Systems, Plaintiffs Herrington, Leon, Quednau, and putative Michigan Subclass Members either would have paid less for their Systems or would not have purchased them at all, or would have negotiated different terms of the warranty.   Plaintiffs Herrington, Leon, Quednau, and putative Michigan Subclass Members did not receive the benefit of their bargain as a result of Generac's misconduct.

396.     Plaintiffs Herrington, Leon, Quednau, and putative Michigan Subclass Members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $250, injunctive relief, and any other relief that is just and proper.

**Violation of Missouri's Merchandise Practices Act**
**Mo. Rev. §§ 407.010, *et seq*.**
**(On Behalf of Plaintiffs Goeke, Vincent, and the Missouri Subclass)**

397.     Plaintiffs Goeke and Vincent hereby adopt and incorporate by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

398.     Generac is a "person" as defined by Mo. Rev. Stat. § 407.010(5).

399.     Generac advertised, offered, or sold goods or services in Missouri and engaged in trade or commerce directly or indirectly affecting the people of Missouri, as defined by Mo. Rev. Stat. § 407.010(4), (6) and (7).

400.     Plaintiffs Goeke, Vincent, and putative Missouri Subclass Members purchased or leased goods or services primarily for personal, family, or household purposes.

401.     Generac engaged in unlawful, unfair, and deceptive acts and practices, in connection with the sale or advertisement of merchandise in trade or commerce, in violation of Mo. Rev. Stat. § 407.020(1), including:

    a. Having extensive knowledge of the defective nature of the Systems and failing to disclose to Plaintiffs Goeke, Vincent, and putative Missouri Subclass Members;

    b. Representing the Systems as capable of safe and reliable management of electricity when they were not due to the Defect;

    c. Conveying a warranty with the sale of its Systems when it does not intend to honor the warranty by replacing the defective Systems with non-defective Systems;

    d. In failing to disclose to Plaintiffs Goeke, Vincent, and putative Missouri Subclass Members that the Systems:

        i. were defective;

        ii. were not able to safely manage electricity;

        iii. were not able to reliably manage electricity;

88

iv.   would prematurely fail;

v.   cannot be expected to fulfill their expected service life; and

vi.   would pose a safety hazard to individuals and their property once the Defect manifests.

e.   Failing to comply with common law and statutory duties pertaining to the manufacture of Generac's Systems, including the Missouri Merchandise Practices Act as well as other states' consumer protection statutes, which was a direct and proximate cause of the injury suffered due to the Defect;

f.   Misrepresenting that it would comply with common law and statutory duties pertaining to the manufacture of Generac's Systems, including duties imposed by the Missouri Merchandise Practices Act as well as other states' consumer protection statutes;

g.   Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the manufacture of Generac's Systems, including duties imposed by the Missouri Merchandise Practices Act as well as other states' consumer protection statutes; and

h.   Failing to timely and adequately notify Plaintiffs Goeke, Vincent, and putative Missouri Subclass Members of the Defect.

402.   Generac's representations and omissions were material because they were likely to lead reasonable consumers to believe that they were purchasing and using Systems which were free of defects; were safely and reliably capable of managing electricity; of high quality; would not prematurely fail; were not a safety hazard; and came with a warranty that Generac would honor.

403.   Generac intended to mislead Plaintiffs Goeke, Vincent, and putative Missouri Subclass Members and induce them to rely on its misrepresentations and omissions.

404.   Generac acted intentionally, knowingly, and maliciously to violate Missouri's Merchandise Practices Act, and recklessly disregarded Plaintiffs Goeke, Vincent, and putative Missouri Subclass Members' rights.

405.   As a direct and proximate result of Generac's unlawful, unfair, and deceptive acts and practices, Plaintiffs Goeke, Vincent, and putative Missouri Subclass Members have suffered

and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages. Had they been aware of the Defect in the Systems, Plaintiffs Goeke, Vincent, and putative Missouri Subclass Members either would have paid less for their Systems or would not have purchased them at all, or would have negotiated different terms of the warranty. Plaintiffs Goeke, Vincent, and putative Missouri Subclass Members did not receive the benefit of their bargain as a result of Generac's misconduct.

406. Plaintiffs Goeke, Vincent, and putative Missouri Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, punitive damages, attorneys' fees and costs, injunctive relief, and any other appropriate relief.

### COUNT XIV
**Violation of Pennsylvania's Unfair Trade Practice and Consumer Protection Law**
**73 P.S. §§ 201-1,** *et seq*.
**(On Behalf of Plaintiffs Fawcett, Figueroa, Hemphill, and the Pennsylvania Subclass)**

407. Plaintiffs Fawcett, Figueroa, and Hemphill hereby adopt and incorporate all preceding paragraphs as though fully set forth herein.

408. Plaintiffs Fawcett, Figueroa, Hemphill and putative Pennsylvania Subclass Members are persons within the context of the Pennsylvania Unfair Trade Practice and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-2(2).

409. Generac is a person within the context of the UTPCPL, 73 P.S. § 201-2(2).

410. At all times relevant hereto, Generac was engaged in trade or commerce as defined under the UTPCPL, 73 P.S. § 201-2(3).

411. Plaintiffs Fawcett, Figueroa, Hemphill and putative Pennsylvania Subclass Members are "consumers" who purchased the Systems for personal, family or household use within the meaning of the UTPCPL, 73 P.S. §§ 201-2(2) and 201.9-2.

412. The UTPCPL prohibits engaging in any "unfair or deceptive acts or practices in the conduct of any trade or commerce…." 73 P.S. § 201-3.

413. Generac's conduct, as described herein, took place within the Commonwealth of Pennsylvania and constitutes unfair or deceptive acts or practices in the course of trade and commerce, in violation of §§ 201-2(4)(v), (vii), (ix), (xiv), and (xxi) of the UTPCPL, including:

    a. Having extensive knowledge of the defective nature of the Systems and failing to disclose to Plaintiffs Fawcett, Figueroa, Hemphill and putative Pennsylvania Subclass Members;

    b. Representing the Systems as capable of safe and reliable management of electricity when they were not due to the Defect;

    c. Conveying a warranty with the sale of its Systems when it does not intend to honor the warranty by replacing the defective Systems with non-defective Systems;

    d. In failing to disclose to Plaintiffs Fawcett, Figueroa, Hemphill and putative Pennsylvania Subclass Members that the Systems:

        i. were defective;

        ii. were not able to safely manage electricity;

        iii. were not able to reliably manage electricity;

        iv. would prematurely fail;

        v. cannot be expected to fulfill their expected service life; and

        vi. would pose a safety hazard to individuals and their property once the Defect manifests.

414. Generac engaged in deceptive trade practices in violation of the UTPCPL by failing to disclose and actively concealing the risks posed by the defective Systems, including that they are a safety risk and prone to premature failure.

415. Generac violated UTPCPL §§ 201-2(4)(v) and (vii) by representing that its Systems have characteristics or benefits that they do not have and that the Systems "are of a particular standard, quality or grade" when they are of another.

416.     Generac advertised the Systems with intent not to sell them as advertised, in violation of UTPCPL § 201-2(4)(ix).

417.     Generac engaged in fraudulent and/or deceptive conduct which creates a likelihood of confusion or of misunderstanding in violation of UTPCPL § 201-2(4)(xxi).

418.     Further, Section 201-(4)(xiv) of the UTPCPL provides that it shall be unlawful in the sale of goods to fail to comply with the terms of any written warranty given to the buyer at or after a contract for the purchase of goods or services is made.

419.     The conduct of Generac offends public policy as established by statutes and common law; is immoral, unethical, oppressive, and/or unscrupulous and caused avoidable and substantial injury to Plaintiffs Fawcett, Figueroa, Hemphill, and putative Pennsylvania Subclass Members (who were unable to have reasonably avoided damages through no fault of their own) without any countervailing benefits to consumers.

420.     Generac's representations and omissions were material because they were likely to lead reasonable consumers to believe that they were purchasing and using Systems which were free of defects; were safely and reliably capable of managing electricity; of high quality; would not prematurely fail; were not a safety hazard; and came with a warranty that Generac would honor.

421.     Generac intended to mislead Plaintiffs Fawcett, Figueroa, Hemphill, and putative Pennsylvania Subclass Members and induce them to rely on its misrepresentations and omissions.

422.     Generac acted intentionally, knowingly, and maliciously to violate the UTPCPL, and recklessly disregarded Plaintiffs Fawcett, Figueroa, Hemphill, and putative Pennsylvania Subclass Members' rights.

423.     Generac owed Plaintiffs Fawcett, Figueroa, Hemphill, and putative Pennsylvania Subclass Members a duty to disclose the true quality of the Systems because Generac: (a)

92

possessed exclusive knowledge of the Defect and accompanying safety risks; (b) intentionally concealed the foregoing from Plaintiffs Fawcett, Figueroa, Hemphill, and putative Pennsylvania Subclass Members; and/or (c) made incomplete representations about the Systems generally, while withholding material facts from Plaintiffs Fawcett, Figueroa, Hemphill, and putative Pennsylvania Subclass Members that contradicted these representations.

424.     As a direct and proximate result of Generac's unlawful, unfair, and deceptive acts and practices, Plaintiffs Fawcett, Figueroa, Hemphill, and putative Pennsylvania Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.  Had they been aware of the Defect in the Systems, Plaintiffs Fawcett, Figueroa, Hemphill, and putative Pennsylvania Subclass Members either would have paid less for their Systems or would not have purchased them at all, or would have negotiated different terms of the warranty. Plaintiffs Fawcett, Figueroa, Hemphill, and putative Pennsylvania Subclass Members did not receive the benefit of their bargain as a result of Generac's misconduct.

425.     Plaintiffs Fawcett, Figueroa, Hemphill, and putative Pennsylvania Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, punitive damages, attorneys' fees and costs, injunctive relief, and any other appropriate relief.

## COUNT XV
### Violation of Virginia's Consumer Protection Act
### Va. Code § 59.1-196, *et seq*.
### (On Behalf of Plaintiff Morse and the Virginia Subclass)

426.     Plaintiff Morse hereby adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

427.     Generac is a "supplier" as defined by Va. Code § 59.1-198.

428. Plaintiff Morse and putative Virginia Subclass Members are "persons" under Va. Code § 59.1-198.

429. The acts described herein constitute "consumer transactions" under Va. Code § 59.1-198.

430. The following constitute unlawful fraudulent acts or practices committed by a supplier in connection with a consumer transaction:

    a. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;

    b. Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model;

    c. Advertising or offering for sale goods that are defective without clearly and unequivocally indicating in the advertisement that the goods are defective;

    d. Advertising goods or services with intent not to sell them as advertised; and

    e. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

431. Generac's conduct, as described herein, took place within the state of Virginia and constitutes unlawful fraudulent acts or practices, including:

    a. Having extensive knowledge of the defective nature of the Systems and failing to disclose to Plaintiff Morse and putative Virginia Subclass Members;

    b. Representing the Systems as capable of safe and reliable management of electricity when they were not due to the Defect;

    c. Conveying a warranty with the sale of its Systems when it does not intend to honor the warranty by replacing the defective Systems with non-defective Systems;

    d. In failing to disclose to Plaintiff Morse and putative Virginia Subclass Members that the Systems:

        i. were defective;

        ii. were not able to safely manage electricity;

        iii. were not able to reliably manage electricity;

94

iv. would prematurely fail;

v. cannot be expected to fulfill their expected service life; and

vi. would pose a safety hazard to individuals and their property once the Defect manifests.

432. Generac's representations and omissions were material because they were likely to lead reasonable consumers to believe that they were purchasing and using Systems which were free of defects; were safely and reliably capable of managing electricity; of high quality; would not prematurely fail; were not a safety hazard; and came with a warranty that Generac would honor.

433. Generac intended to mislead Plaintiff Morse and putative Virginia Subclass Members and induce them to rely on its misrepresentations and omissions.

434. Generac acted intentionally, knowingly, and maliciously to violate the Virginia Consumer Protection Act, and recklessly disregarded Plaintiff Morse and putative Virginia Subclass Members' rights.

435. Generac owed Plaintiff Morse and putative Virginia Subclass Members a duty to disclose the true quality of the Systems because Generac: (a) possessed exclusive knowledge of the Defect and accompanying safety risks; (b) intentionally concealed the foregoing from Plaintiff Morse and putative Virginia Subclass Members; and/or (c) made incomplete representations about the Systems generally, while withholding material facts from Plaintiff Morse and putative Virginia Subclass Members that contradicted these representations.

436. As a direct and proximate result of Generac's unlawful fraudulent acts and practices, Plaintiff Morse and putative Virginia Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages. Had they been aware of the Defect in the Systems, Plaintiff Morse and putative Virginia Subclass Members either would have paid less for their Systems or would not have purchased

95

them at all, or would have negotiated different terms of the warranty. Plaintiff Morse and putative Virginia Subclass Members did not receive the benefit of their bargain as a result of Generac's misconduct.

437. Plaintiff Morse and putative Virginia Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, punitive damages, attorneys' fees and costs, injunctive relief, and any other appropriate relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court:

A.      Certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Appoint Plaintiffs as Class Representative of the Classes;

C.      Appoint the undersigned counsel as Class Counsel;

D.      Award damages, including compensatory, exemplary, and statutory damages, to Plaintiffs and the Classes in an amount to be determined at trial;

E.      Permanently enjoin Generac from engaging in the wrongful and unlawful conduct alleged herein;

F.      Award Plaintiffs and the Classes their expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

G.      Award Plaintiffs and the Classes pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law; and

H.      Award such further relief as the Court deems appropriate.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: November 21, 2022                          Respectfully submitted,

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**

 s/ David K. Lietz
David K. Lietz
5335 Wisconsin Avenue NW, Suite 440
Washington, DC 20015
Tel: (866) 252-0878
Fax: (202) 686-2877
dlietz@milberg.com

Scott C. Harris*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
900 W Morgan Street
Raleigh, NC 27603
Tel: (919) 600-5000
sharris@milberg.com

Harper T. Segui*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
825 Lowcountry Blvd., Suite 101
Mt. Pleasant, SC 29464
Tel: (919) 600-5000
hsegui@milberg.com

Thomas Pacheco*
MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC
15453 Indianola Drive
Derwood, MD 20855
Tel: (212) 946-9305
tpacheco@milberg.com

Jonathan B. Cohen*
Alex Honeycutt*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
jcohen@milberg.com
ahoneycutt@milberg.com

*Application to be admitted pro hac vice is forthcoming*

*Attorneys for Plaintiffs and the Proposed Class*

97